Filed 4/8/16  Dispatch & Tracking Solutions v. City of San Diego CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115. *

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| DISPATCH & TRACKING SOLUTIONS, LLC, | |
| Cross-complainant and Appellant, | D062426 |
| v. | |
| CITY OF SAN DIEGO et al., | |
| Cross-defendants and Respondents. | |
| DISPATCH & TRACKING SOUTIONS, LLC, | |
| Cross-complainant and Appellant, | D062927 |
| v. | |
| CITY OF SAN DIEGO et al., | (Super. Ct. No. 37-2009-00087082-CU-BT-CTL) |
| Cross-defendants and Appellants; | |
| JOHN WICKER et al., | |
| Cross-defendants and Respondents. | |

AUTHORIZED CITY TOWING et al.,

     Plaintiffs, Cross-defendants and Appellants,

     v.

DISPATCH & TRACKING SOLUTIONS, LLC,

     Defendant, Cross-complainant and Appellant;

CITY OF SAN DIEGO et al.,

     Cross-defendants and Appellants.

D063855

CONSOLIDATED APPEALS from a judgment and orders of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Affirmed in part; reversed in part.

ClintonBailey, Mark Bailey, Sean T. McGee; ONE LLP, Peter Afrasiabi and Kathryn M. Davis for Cross-complainant and Appellant in D062426 and D062927 and for Defendant, Cross-complainant and Appellant in D063855.

Moscone Emblidge Sater & Otis, Moscone Emblidge & Otis, G. Scott Emblidge and Matthew K. Yan for Cross-defendants and Respondents City of San Diego, TEGSCO, LLC, John Wicker and John Pendleton in D062426, for Cross-defendants and Respondents John Wicker and John Pendleton in D062927, and for Cross-defendants and Appellants City of San Diego and Tegsco, LLC, in D062927 and D063855.

2

Chapin Fitzgerald, Fitzgerald Knaier, Kenneth M. Fitzgerald and Jennifer Arnold for Cross-defendants and Respondents Orion Communications, Inc., and Leslie Delatte in D062426, and for Cross-defendants and Appellants Orion Communications and Leslie DeLatte in D062927 and D063855.

Webb & Carey, Patrick D. Webb and Kevin A. Carey for Cross-defendants and Appellants Authorized City Towing, Nancar, Inc., C & D Towing Specialists, Inc., Starrue, Inc., San Diego Police Towing Operators, Inc., and A to Z Enterprises, Inc., in D062927, and for Plaintiffs, Cross-defendants and Appellants Authorized City Towing, Allied Gardens Towing, Inc., Nancar, Inc., C & D Towing Specialists, Inc., Starrue, Inc., San Diego Police Towing Operators, Inc., and A to Z Enterprises, Inc., in D063855.

INTRODUCTION

This litigation arises out of the decision of the City of San Diego (the City) to award a competitively bid contract to provide the City a computerized system for dispatching tow trucks (the towing contract) to TEGSCO, LLC, doing business as San Francisco AutoReturn (AutoReturn). In providing similar services to other municipalities, AutoReturn used tow dispatching communications software provided by Dispatch & Tracking Solutions, LLC (DTS) known as Law Enforcement Towing System (LETS) and Towing Management System (TMS). AutoReturn's bid proposal to the City referenced AutoReturn's intended use of DTS's LETS/TMS software as a component of AutoReturn's own tow dispatch and impound management software package known as the AutoReturn Integrated Enterprise System (ARIES).

Authorized City Towing and five towing companies it subcontracted with (together ACT) submitted a competing bid for the towing contract in which ACT also proposed using LETS/TMS.[1]  ACT had provided computerized tow dispatch services to the City using LETS/TMS before the City awarded the contract to AutoReturn.   During the competitive bidding process for the towing contract, ACT informed the City and AutoReturn that it held an exclusive license to use LETS/TMS software in San Diego County.  Because of ACT's exclusive license claim, after the City awarded the towing contract to AutoReturn, AutoReturn decided to replace DTS's LETS/TMS software with similar software provided by Orion Communications, Inc. (Orion).  However, as a result of the present litigation, Orion decided not to work with AutoReturn in San Diego.  After Orion withdrew, AutoReturn developed its own tow management software to replace the LETS/TMS component of its ARIES package.

ACT sued the City, AutoReturn, DTS, Orion and related parties for—among other causes of action—breach of contract, intentional interference with contractual relations, intentional interference with prospective economic advantage, unfair business practices, and misappropriation of trade secrets arising out of its alleged exclusive license agreement with DTS and the City's award of the towing contract to AutoReturn.  DTS filed a cross-complaint against ACT, the City, AutoReturn, and Orion.  At issue in this

---

[1]     The five towing companies that contracted with Authorized City Towing are Allied Gardens Towing, Inc.; C & D Towing Specialists, Inc.; Starrue, Inc.; Nancar, Inc.; and San Diego Police Towing Operators.  ACT's opening brief omits Nancar, Inc., from its list of towing subcontractors.

appeal are DTS's cause of action under the California Uniform Trade Secrets Act (Civ. Code,[2] § 3426 et seq.) (CUTSA or UTSA) against AutoReturn, the City, and Orion and Orion's chief executive officer, Leslie DeLatte,[3] for misappropriation of trade secrets, and a cause of action against AutoReturn for breach of a joint venture agreement.

The trial court entered judgment against ACT and in favor of AutoReturn on ACT's operative fourth amended complaint after granting AutoReturn's motion for summary judgment on that complaint. The court also entered judgment against DTS and in favor of AutoReturn, Orion, and the City on DTS's second amended cross-complaint after granting Orion's motion for summary judgment and AutoReturn and the City's motion for summary judgment on the second amended cross-complaint. The court granted a motion by Orion for attorney fees and costs against DTS under section 3426.4 and awarded Orion fees of $120,000 based on its finding that DTS prosecuted its misappropriation of trade secrets claim against Orion in bad faith. AutoReturn and the City moved for attorney fees and costs under section 3426.4 against both ACT and DTS. The court denied the motion as to ACT on the ground it lacked jurisdiction to award fees against ACT under section 3426.4 because ACT had dismissed its trade secret cause of

_____

2    All subsequent statutory references are to the Civil Code unless otherwise specified.

3    Subsequent references to AutoReturn include AutoReturn's executive officers, John Wicker and John Pendleton, who are identified as cross-defendants in DTS's second amended cross-complaint. Subsequent references to Orion include DeLatte.

action. The court granted the motion as to DTS and awarded AutoReturn and the City attorney fees and costs against DTS in the amount of $450,000.[4]

DTS, ACT, Orion, and AutoReturn and the City have all appealed. DTS contends the court erred in (1) denying its motions to redact and seal its proprietary information under section 3426.5; (2) summarily adjudicating its misappropriation of trade secrets claim in favor of Orion, AutoReturn, and the City; (3) denying its motion to reconsider the summary adjudication of its misappropriation of trade secrets claim; (4) summarily adjudicating its cause of action for breach of joint venture agreement in AutoReturn's favor; (5) awarding Orion attorney fees under section 3426.4; (6) awarding AutoReturn attorney fees under section 3426.4; and (7) denying it` leave to amend its cross-complaint to add causes of action for interference with contractual relations and breach of fiduciary duty against Orion and AutoReturn, respectively, on the ground the proposed causes of action were superseded under the CUTSA.

ACT contends the court should have denied AutoReturn's motion for summary judgment as procedurally defective because AutoReturn did not provide its supporting evidence with the motion. ACT further contends that the court erred in summarily adjudicating, in AutoReturn's favor, ACT's seventh cause of action for unfair business

---

4 AutoReturn and the City also filed a motion for sanctions under Code of Civil Procedure section 128.7 against both ACT and DTS based on their having brought a frivolous motion to disqualify AutoReturn and the City's counsel. The court granted the motion and awarded sanctions jointly against ACT and DTS and their respective counsel in the amount of $13,925. Neither ACT nor DTS appeal the award of sanctions under Code of Civil Procedure section 128.7.

6

practices, eighth cause of action for intentional interference with contractual relations, and ninth cause of action for intentional interference with prospective economic advantage.

Orion contends the court erred in denying attorney fees incurred by its Texas counsel as part of the fee award to Orion under section 3426.4. AutoReturn and the City contend that the court erred in denying their motion for attorney fees under section 3426.4 as to ACT. They also contend that the court erred in denying AutoReturn certain expert witness fees against DTS under section 3426.4.

We affirm the summary adjudications of DTS's statutory cause of action for misappropriation of trade secrets and reverse the summary adjudication of DTS's cause of action for breach of joint venture agreement. We affirm the orders awarding Orion and the City and AutoReturn attorney fees and costs against DTS under section 3426.4. We reverse the orders denying DTS's requests to file records under seal. We reverse the order denying AutoReturn's request for attorney fees under section 3426.4 against ACT with directions to reconsider that request, and reverse the summary adjudication of ACT's causes of action against AutoReturn for unfair business practices, intentional interference with contractual relations, and intentional interference with prospective economic advantage.

FACTUAL AND PROCEDURAL BACKGROUND

*ACT's History with DTS and LETS/TMS*

In 1994 ACT contracted with Ball Corporation (Ball), a company that had created satellite tracking software, to design and develop a computer automated tow dispatch

7

system for vehicle tows requested by the San Diego Police Department (SDPD).  The system that Ball agreed to develop "to facilitate dispatching and accounting of SDPD tow requests" included a message router system and database query system (MRDBQ), and a computer automated tow system known as CATS.  Ball incorporated CATS into the MRDBQ system to interface between an individual tow company's dispatch terminal and MRDBQ.  The CATS software took tow requests from SDPD officers and communicated them in a format that was understandable by the tow companies.  Ball installed CATS software and supporting hardware at each of the tow companies as a "stand alone" platform for the tow companies to manage their towing.   An enhanced version of MRDBQ became known as LETS, and CATS became known as TMS.   The Ball contract was assigned to DTS in 2003.  The City awarded each of the ACT towing companies a tow contract with a commencement date of January 1, 1995.

In October 2003 DTS and ACT entered into an agreement that extended and modified the original Ball contract (the 2003 amendment).  The 2003 amendment provided that in the event ACT's contract with the City was extended past its expiration date of December 31, 2004, DTS was "strictly prohibited from entering into any communications or negotiations with the City . . . or any other person relating to operational or dispatching/communications without first obtaining prior written consent from [ACT's] president or other authorized representative[,]" and that the original Ball contract and the 2003 amendment would "remain in full force and effect . . . for a period of sixty (60) months after the termination of [ACT's] members' services under the City Contract."  The 2003 amendment also provided that DTS granted ACT "and its members

an irrevocable license for the exclusive use in San Diego County, California, of the TMS software, including, but not limited to, any related software and/or updates or revisions thereto."  The 2003 amendment also stated that "DTS shall refrain from offering any similar or competing service to any person operating a tow company or engaged in tow and/or related services within [San Diego County], including, but not limited to . . . the City, and/or any third party tow company."

*AutoReturn's History with DTS and LETS/TMS*

AutoReturn was founded in 2002 and offers automated, computerized tow management services to municipalities across the United States.  In 2012 when AutoReturn filed its motion for summary judgment in this case, it was providing towing management services to the City of San Diego, the City and County of San Francisco, and Baltimore County, Maryland.

According to AutoReturn's chief technology officer, John Pendleton, from 2004 to 2011 AutoReturn included LETS/TMS as part of ARIES, its own integrated tow management software package.  AutoReturn used LETS/TMS under a license agreement that gave AutoReturn access and use of the LETS/TMS system to carry out its Baltimore County and San Francisco contracts in return for regular payments to DTS in the form of either a monthly flat rate usage fee or a certain amount for each tow request processed by LETS/TMS.  AutoReturn maintains that DTS's relationship to AutoReturn was always that of a vendor and licensor, and that AutoReturn never contemplated forming a joint venture with DTS in which AutoReturn and DTS would share profits, control, and

9

ownership. DTS claims that it formed a joint venture with AutoReturn in 2008 to jointly pursue municipal tow dispatch and management contracts throughout the United States.

*The City's Request for Proposals and Award of the Towing Contact*

In 2008 the City issued a request for proposals (RFP) seeking bids to provide the City with computerized tow dispatch services. The RFP did not require that any bidding company use LETS/TMS software or any other particular software in its proposal. ACT, the City's incumbent tow dispatch provider, submitted a proposal in response to the RFP.

AutoReturn also submitted a proposal in response to the City's RFP. AutoReturn wanted to use LETS/TMS in its proposal to avoid incurring additional expenses and having to retrain its employees on different software. In the course of AutoReturn's preparing its bid, DTS management notified AutoReturn that DTS had been sold to a company called C:Logic. Before the change in ownership, AutoReturn executives spoke to DTS management about licensing LETS/TMS for use in San Diego. DTS's management suggested that ACT would take issue with DTS's licensing LETS/TMS to AutoReturn for use in San Diego, but agreed to work with AutoReturn on its proposal. After DTS changed ownership, C:Logic's chief executive officer (CEO), Larry Estes, informed AutoReturn that ACT claimed an exclusive license to use LETS/TMS in San Diego. However, based on the assurances of Estes and DTS management that the exclusive license was invalid and unenforceable, AutoReturn submitted a proposal to the City in May 2008 that specified LETS/TMS as a component of ARIES. ACT also included LETS/TMS in its bid proposal.

10

In December 2008 the City informed AutoReturn that it had won the towing contract. The City gave AutoReturn's bid an "Overall Rank" of 1 and gave ACT's bid a rank of 2. In January 2009, ACT's counsel sent the City a letter giving notice that ACT intended to protest the bid on the grounds that (1) "City employees and the evaluation team members engaged in misconduct or impropriety in knowingly awarding the [towing] contract to a bidder interfering with [ACT's exclusive license to use LETS/TMS in San Diego County]"; and (2) "the bid of AutoReturn should have been deemed as nonresponsive by virtue of its unauthorized incorporation of LETS and/or TMS into their [*sic*] bid package." The City responded by letter stating that "the City's RFP *did not require that the winning bidder use the LETS and/or TMS systems.*" (Original italics.) The City concluded that ACT had not shown any misconduct or impropriety by City staff or other grounds for a formal bid protest hearing. In August 2009 the City and AutoReturn executed a memorandum of agreement (MOA) confirming that AutoReturn would provide tow dispatch services to the City.

Because of the dispute over ACT's claimed exclusive license to use LETS/TMS in San Diego County and the City's award of the towing contract to AutoReturn, AutoReturn contracted with Orion to provide towing services software that would replace LETS/TMS software as a component of AutoReturn's ARIES software package. However, when Orion's CEO DeLatte became aware of the dispute over AutoReturn's use of LETS/TMS in its bid and the potential for Orion to become involved in the present litigation, she terminated Orion's work with AutoReturn. In response to Orion's withdrawal, AutoReturn directed its own software engineers to redesign ARIES to cover

11

the functions that LETS/TMS would have performed under the towing contract with the City. Since completing its overhaul of ARIES in August 2011, AutoReturn has relied exclusively on its own software for tow management.

*Procedural Background*

As noted, ACT filed a fourth amended complaint against the City, AutoReturn, DTS, and Orion. Relevant to this appeal are ACT's seventh cause of action against AutoReturn for "Unfair Business Practices–Violation of Business & Professions Code [s]ection 17200 et seq."; eighth cause of action against AutoReturn for intentional interference with contractual relations; ninth cause of action against DTS and AutoReturn for intentional interference with prospective economic advantage; and 18th cause of action against DTS, AutoReturn, and the City for misappropriation of trade secrets. On appeal, ACT challenges the court's summary adjudication of the seventh, eighth and, ninth causes of action in AutoReturn's favor.[5]

DTS filed a second amended cross-complaint that included a fifth cause of action against AutoReturn for breach of joint venture agreement; a sixth cause of action for misappropriation of trade secrets and seventh cause of action for "Common Law Misappropriation" against AutoReturn, the City, and Orion; an eighth cause of action against Orion for interference with contractual relations; and a 12th cause of action against AutoReturn and Orion for unfair competition. In July 2012 the court ruled that

---

[5]     ACT does not challenge the disposition of any of its causes of action as to the City or DTS.

none of DTS's causes of action against Orion had merit and granted Orion's motion for summary judgment.

In September 2012 the court granted the City and AutoReturn's motion for summary judgment that targeted DTS's fifth cause of action for breach of joint venture agreement and sixth cause of action for misappropriation of trade secrets, resulting in entry of judgment in favor of the City and AutoReturn on DTS's second amended cross-complaint.[6]  The minute order granting the City and AutoReturn's summary judgment motion noted that DTS had filed "several motions/applications seeking leave to file under seal documents that were previously filed conditionally under seal.  The court denied the first of these on July 6, 2012, and has ruled consistently on the follow-on motions but has stayed the actual unsealing. . . .  DTS has appealed these rulings."

As noted, on motions by Orion and the City and AutoReturn seeking attorney fees and costs under section 3426.4, the court awarded Orion $120,000 and awarded the City and AutoReturn $450,000 in attorney fees and costs.  On February 28, 2013, the court entered an amended judgment that reflects its summary judgment rulings and awards of attorney fees and costs.

---

[6]    A minute order denying DTS leave to file a third amended cross-complaint notes that a previous judge assigned to the case ruled, in sustaining a demurrer, that "DTS's claims for common law misappropriation, interference with contract and contractual relations, and undue business practices were superseded by DTS's claim for Misappropriation of Trade Secrets (Civil Code section 3426 *et seq*.), as all of these claims were premised on a common nucleus of fact relating to alleged misuse of DTS's software."

13

DISCUSSION

*DTS'S APPEAL*

I. *Summary Adjudication of DTS's Sixth Cause of Action
for Misappropriation of Trade Secrets*

DTS contends the trial court erred in granting summary adjudication of its sixth cause of action for misappropriation of trade secrets in favor of Orion, AutoReturn, and the City.

*Standard of review*

A motion for summary judgment or adjudication must be granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "A defendant 'moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact.' [Citation.] A defendant may meet this burden either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense. [Citation.] . . . 'A defendant moving for summary judgment may establish that an essential element of the plaintiff's cause of action is absent by reliance on the pleadings, competent declarations, binding judicial admissions contained in the allegations of the plaintiff's complaint, responses or failures to respond to discovery, and the testimony of witnesses at noticed depositions.' " (*Mills v. U.S. Bank* (2008) 166 Cal.App.4th 871, 894 (*Mills*).) "The defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action. The defendant may also present evidence that the plaintiff does not possess, and

14

cannot reasonably obtain, needed evidence . . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855 (*Aguilar*).)

"If the defendant's prima facie case is met, the burden shifts to the plaintiff to show the existence of a triable issue of material fact with respect to that cause of action or defense. [Citations.] ' "When opposition to a motion for summary judgment is based on inferences, those inferences must be reasonably deducible from the evidence, and not such as are derived from speculation, conjecture, imagination, or guesswork." ' " (*Mills, supra,* 166 Cal.App.4th at p. 894.) "[R]esponsive evidence that gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.) For an inference to be sufficient to establish a triable issue of material fact, the inference must show or imply the existence of the required finding *more likely than* the nonexistence of the finding, either by itself or together with other inferences or evidence. (*Aguilar, supra,* 25 Cal.4th at p. 857; accord, *Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1474.) That is because an "inference is reasonable if, and only if, it implies [existence of the finding is] *more likely than* [its nonexistence]." (*Aguilar*, at p. 857; accord, *Smith v. Wells Fargo Bank,* at p. 1474.)

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) " 'In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's

15

determination of a motion for summary judgment.' [Citation.] '[W]e are not bound by the trial court's stated reasons for its ruling on the motion; we review only the trial court's ruling and not its rationale.' " (*Mills, supra,* 166 Cal.App.4th at p. 895.) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [plaintiff's] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*); *Aguilar, supra,* 25 Cal.4th at p. 843.) However, "[a] different standard of review applies to the court's evidentiary rulings in connection with the motion, which we review for abuse of discretion." (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181; *Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 82-83.)

*Authority regarding misappropriation of trade secrets*

Under the UTSA, "[a] 'trade secret' is 'information, including a formula, pattern, compilation, program, device, method, technique, or process that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.' (Civ. Code, § 3426.1, subd. (d).)" (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1452 (*Whyte*).) "The test for trade secrets is whether the matter sought to be protected is information (1) which is valuable because it is unknown to others and (2) which the owner has attempted to keep secret." (*Id.* at p. 1454.) "Under the UTSA, a prima facie claim for misappropriation of trade secrets 'requires the plaintiff to

16

demonstrate:  (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff.' "  (*CytoDyn of New Mexico, Inc. v. Amerimmune Pharmaceuticals, Inc.* (2008) 160 Cal.App.4th 288, 297.)  "The ultimate determination of trade secret status is subject to proof presented at trial."  (*Whyte, supra,* 101 Cal.App.4th at p. 1453.)

In an action for misappropriation of a trade secret under the UTSA, "before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity subject to any orders that may be appropriate under Section 3426.5 of the Civil Code."  (Code Civ. Proc., § 2019.210.)  "[A] party seeking to protect trade secrets must 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.' "  (*Whyte, supra,* 101 Cal.App.4th at p. 1453.)

"[Code of Civil Procedure] section 2019.210 serves four interrelated goals: ' "First, it promotes well-investigated claims and dissuades the filing of meritless trade secret complaints.  Second, it prevents plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets.  [Citations.]  Third, the rule assists the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope.  [Citations.]  Fourth, it enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve

17

of trial to effectively defend against charges of trade secret misappropriation." ' " (*Brescia v. Angelin* (2009) 172 Cal.App.4th 133, 144.)

In the present case, DTS filed a "second amended statement . . . in compliance with Code of Civil Procedure [section] 2019.210" that identified the following five "trade secret databases:" (1) The "reasons code database," which collects, tracks, and propagates information about the reasons for a tow; (2) the "beat or district database," which provides information about the geographic region at issue; (3) the "hold reasons database," which collects information concerning the reasons that vehicles are held; (4) the "holding unit database," which collects information relevant to the agency holding an impounded vehicle; and (5) the "administrative fees database," which collects information relative to reason codes connected with fee charges.

DTS's trade secret statement also identified "[f]low of control trade secrets" with the following explanation: "The static information in the [specified trade secret] databases is valuable in and of itself, but of greater value in any automated system is the way in which that information is used. The data in each of the databases . . . also controls both the functioning of the program and the flow of information. Each new data entry triggers different parts of each database and directs both the program and its users to do different things. The database can direct the program to ask the users for additional information, transmit information to a third party, or direct the users to take specific courses of action outside the confines of the program. Because each combination of instances can trigger a different set of directions, the number of different direction sets is enormous. DTS contends that each possible combination is a trade secret that has been

18

misappropriated by Cross-Defendants and is at issue in this litigation. Each instruction set which translates a combination of inputs into a concrete course of action represents a use of the underlying data and is therefore a trade secret distinct from the trade secret claimed in the static databases. [¶] . . . In the present case, DTS alleges the Cross-Defendants misappropriated both the static data and the dynamic flow of control or instruction sets."

A. *Summary Adjudication in Favor of Orion*

In its motion for summary judgment/adjudication, Orion argued there was no evidence that it misappropriated any trade secrets and that DTS's specified trade secrets did not qualify as trade secrets because DTS did not make reasonable efforts to maintain their secrecy. The trial court concluded that DTS failed to raise a triable issue of fact on any of these points and that DTS did not show that it was damaged by Orion's alleged misappropriation of trade secrets.

Assuming, without deciding, that DTS's opposition evidence was sufficient to raise a triable issue of facts as to whether the databases DTS specified as trade secrets qualify as trade secrets and DTS made reasonable efforts to maintain their secrecy, we conclude the court nevertheless correctly granted Orion's motion for summary judgment based on the lack of evidence that Orion misappropriated any trade secret. As evidence that Orion misappropriated DTS's trade secret databases, DTS presented an e-mail sent

19

by AutoReturn employee Jason Miller that includes XML schema[7] that DTS suggests was from Orion. DTS also presented an e-mail from Miller that included reason code script allegedly prepared by Orion that was similar to DTS's reason code script.

DTS's computer science expert Bruce Abramson stated in a declaration that "[t]he defendants had access to DTS's software including its databases, and at least some if not all of the underlying source code[,]" and that "DTS granted the Defendants such access subject to an agreed code of confidentiality and limitations on the ways that the Defendants could use the software." Abramson asserted that "[a]t least some parts of the Defendants' competing software system was copied directly from DTS's software," and that evidence "proves conclusively that the Defendants made at least some improper use of DTS's software." Abramson had "seen one document purporting to be part of the Defendants' implementations of its database paralleling one of DTS's claimed trade secret databases, and compared it to the analogous portion of the DTS system." He opined that "the two database fragments are similar enough to suggest that Defendants['] inappropriate use of DTS's software extended to this particular trade secret."[8]

---

7 In its opposition to Orion's summary judgment motion, DTS explained that "XML is a 'markup language' designed to present materials in a way that both machines and humans can read and understand. [Citation.] An XML schema is one type of document written in XML language."

8 The record does not contain a complete copy of the declaration that Abramson prepared in opposition to Orion's summary judgment motion. The copy in the record begins on page seven and portions of the declaration are redacted. In DTS's sealed appendix, the declaration that Abramson prepared in opposition to *AutoReturn and the City's* motion for summary judgment appears twice, presumably through inadvertence.

20

Orion objected to these statements by Abramson on the grounds of lack of foundation and assuming facts not in evidence. Orion explained that Abramson's opinions were not based on reasonable inferences, there was no evidence that DTS granted Orion access to DTS's software subject to a code of confidentiality and limitation on the ways the software could be used, Abramson did not state the basis for his opinion that Orion had access to or copied DTS's software, and he assumed without factual support that the document he referred to was developed by Orion. The court sustained Orion's objections.

Abramson also compared the alleged Orion XML schema and reason code script to DTS's XML schema and reason code script and noted "a number of stylistic similarities that are unlikely to have arisen by sheer coincidence, including words misspelled the same way in both schemas, and arbitrary-length lists assigned the same arbitrary lengths." He concluded that "[t]he only plausible explanation for such stylistic similarities is that the designers of the second schema–*Orion's by assumption*–simply copied the first schema (i.e. DTS's schema)." (Italics added.) Regarding his comparison of the reason code scripts, Abramson stated: "Though they are not identical, the similarities overwhelm the differences—thereby suggesting that Defendants' inappropriate use of DTS's systems and software extended into the specific components claimed as trade secrets." Abramson concluded that "it appears quite clear that Orion copied DTS's schema—thereby making inappropriate use of DTS's property in violation

However, portions of Abramson's declaration in opposition to Orion's motion not otherwise in the record are quoted in Orion's written objections to DTS's evidence.

of existing confidentiality agreements—and likely continued its copying to the full extent possible given the access that DTS granted it, including into the realm of the protected trade secrets that DTS has indentified in this matter."

Orion objected to Abramson's statements about the similarities between the XML schema he compared, his opinion that the only plausible explanation for the similarities was that Orion copied DTS's schema, and his suggestion that "Defendants' inappropriate use of DTS's systems and software extended into the specific components claimed as trade secrets" on the grounds they were irrelevant, lacked foundation, assumed facts not in evidence, and were speculative. Regarding relevancy, Orion noted that Abramson did not opine that Orion misappropriated DTS's claimed trade secrets; his opinion was limited to his conclusion that Orion copied a schema that was not one of DTS's claimed trade secrets. Orion also objected that Abramson did not support his assumption that the XML schema in question was Orion's, and the e-mail containing the schema showed that it was sent by an AutoReturn employee. The court sustained the objections.

Orion objected to Abramson's statements that stylistic similarities between the schemas he compared were "unlikely to have arisen by sheer coincidence, including words misspelled the same way in both schemas, and arbitrary-length lists assigned the same arbitrary lengths," and that "[t]he only plausible explanation for such stylistic similarities is that the designers of the second schema—Orion's by assumption—simply copied the first schema (i.e. DTS's schema)." Orion objected the statements were irrelevant because Abramson's opinion was "limited to his conclusion that Orion copied a schema, which DTS does not claim to be a trade secret." Orion further objected that the

22

statements lacked foundation, assumed facts not in evidence, and were speculative, contending that the XML schema in question was AutoReturn, and Abramson did not support his assumption that it was Orion's. The court sustained Orion's objections on all stated grounds.

Among other grounds, Orion objected to Abramson's statement that the similarities between the reason code scripts he compared "overwhelm the differences–thereby suggesting that Defend[an]ts' inappropriate use of DTS's systems and software extended into the specific components claimed as trade secrets[,]" as speculative and lacking foundation. Orion argued that Abramson had not provided "any factual basis for his speculation that copying of the non-trade secret code fragment suggests inappropriate use that extended to claimed trade secrets." The court sustained the objection. The court also sustained Orion's objection on grounds of lack of foundation and speculation to Abramson's conclusion that Orion copied DTS's, "thereby making inappropriate use of DTS's property in violation of existing confidentiality agreements—and likely continued its copying to the full extent possible given the access that DTS granted it, including into the realm of the protected trade secrets that DTS has indentified in this matter."

We find no abuse of discretion in the court's evidentiary rulings. The court reasonably sustained the noted objections for the reasons stated by Orion. DTS complains that the court denied it due process by not allowing it "discourse" on the sustained objections and an opportunity to cure any foundational defects. There was no due process violation. DTS received Orion's evidentiary objections and the court's rulings on them before oral argument and therefore had the opportunity to address them

23

then. The court was not required to provide the parties an opportunity to argue the merits of each other's evidentiary objections; it was required only to rule on them. (See Cal. Rules of Court, rule 3.1354; *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 512, fn. 15 [trial court is not required to explain evidentiary rulings; it need only expressly rule on each evidentiary objection].)

In any event, Abramson's declaration had no evidentiary value on the issue of Orion's alleged copying of DTS's trade secrets. It was purely speculative for Abramson to infer from evidence that Orion *may have* copied material that was not a trade secret that Orion also copied trade secret material. It was further speculative for Abramson to *assume* that the copying (i.e., designing of the second schema) was done by Orion without articulating any basis for that assumption. Orion submitted DeLatte's declaration explaining that the EML schema was not Orion's and that Jason Miller, the sender of the e-mail that included the XML schema in question, was an AutoReturn employee. The Abramson declaration that DTS filed in opposition to AutoReturn and the City's later motion for summary judgment was modified to reflect that AutoReturn rather than Orion authored the XML code that was copied.

As noted, to defeat summary judgment, inferences from opposition evidence must be reasonably deducible and not constitute mere " 'speculation, conjecture, imagination, or guesswork.' " (*Mills, supra,* 166 Cal.App.4th at p. 894.) An inference must show or imply the existence of the required finding *more likely than* the nonexistence of the finding, either by itself or together with other inferences or evidence. (*Aguilar, supra,* 25 Cal.4th at p. 857.) Further, although an expert may rely on inadmissible matter in

24

forming an opinion, "that matter relied upon must 'provide a reasonable basis for the particular opinion offered.'  [Citation.]  An expert opinion may not be based on conjectural or speculative matters."  (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115.)  Abramson's inference that Orion or some other entity "likely" copied DTS's trade secret material based on evidence that someone copied DTS's non-trade-secret XML schema is conjectural and insufficient to raise a triable issue of material fact on the issue of trade secret misappropriation.

Moreover, notwithstanding its rulings on Orion's evidentiary objections to Abramson's declaration, the court considered the XML schema and reason code documents that Abramson compared and ruled that they did not raise a triable issue of fact as to whether Orion misappropriated DTS's trade secrets.  The court stated:  "[T]he only two pieces of evidence DTS argues creates a material issue of fact whether Orion misappropriated DTS's trade secrets, an XML schema and reason code script, do not do so.  The XML schema and reason code script are not the five (5) databases DTS . . . identified as its trade secrets.  Further, DTS has not shown that these . . . documents have any independent economic value to DTS by virtue of being secret.  The XML schema was not created by Orion . . . .  Thus, it is not evidence of Orion copying anything belonging to DTS.  Also, the reason script does not create a triable issue as it is nothing more than a program used to harvest the reason cars are towed from the City's database.  There is nothing secret, or valuable by virtue of being secret, about the reason cars are towed, nor about a script to migrate the City's tow reason data from one system to the other.  Many of the 'reason codes' are simply citations to the

25

California Vehicle Code or the Municipal Code, undeniably public documents. There is no evidence that Orion copied the DTS system or the database programming. Rather, it only prepared to harvest the data (which is owned by the City) from that database. Orion never got to that point, as it pulled out of the project when it found out DTS was suing over the bid it lost."

The court's key findings, which the record supports, were that DTS did not identify the XML schema and reason code script as trade secrets,[9] the XML schema was not created by Orion, and there is nothing secret, or valuable by virtue of being secret, about the reason cars are towed. Further, as Abramson acknowledged, there were differences between DTS's reason codes database and the reason code script Abramson compared it to that the court noted were "sufficient to negate the assertion of wholesale copying." The court correctly granted summary judgment in Orion's favor as to DTS's cause of action for misappropriation of trade secrets.

B. *Summary Adjudication in Favor of AutoReturn and the City*

AutoReturn and the City sought summary adjudication of DTS's sixth cause of action for misappropriation of trade secrets on the grounds that DTS failed to identify a trade secret and neither AutoReturn nor the City misappropriated any trade secret. In its

---

9    Although DTS identified its "reasons code" database as one its trade secrets, Abramson stated in his declaration that the reason code script and DTS's database were not identical. As noted, Abramson stated that "the similarities overwhelm the differences—thereby suggesting that Defend[an]ts' inappropriate use of DTS's systems and software extended into the specific components claimed as trade secrets." The trial court correctly sustained Orion's objection to Abramson's "suggestion" of trade secret misappropriation on the grounds it lacked foundation and was speculative.

26

order granting summary judgment as to the sixth cause of action, the court stated it "continues to be of the view that DTS has failed to demonstrate the existence of any trade secrets in the first place."

The court further ruled that there was "no material evidence of misappropriation." Similar to its ruling on Orion's summary judgment motion, the court noted that depositions had "narrowed the dispute to two documents AutoReturn allegedly sent to Orion: an XML schema file and an Orion reason code script." The court concluded that the City was entitled to summary adjudication because "[t]here is nothing implicating the City in any misappropriation." The court ruled that as to AutoReturn, DTS failed to raise a triable issue of fact, noting, among other things, that "DTS failed to indentify the 'schema' as a trade secret[, and that Abramson stated in] his declaration that '[l]ittle if anything about XML is important . . . to the present dispute.' " Regarding the reason code script, the court stated that it had "already expressed its view that this document is largely based on the California Vehicle Code, the exact opposite of a protectable trade secret, and even if it were otherwise, there are differences between the databases . . . sufficient to negate the assertion of wholesale copying."

We conclude the trial court correctly found that DTS failed to raise a triable issue of fact as to whether AutoReturn or the City misappropriated any alleged trade secret. AutoReturn presented evidence that it developed ARIES for use in San Diego from the public information and SDPD's tow operations manual provided by the City. AutoReturn's former chief technology officer Pendleton stated in a declaration that AutoReturn developed AIRES based on AutoReturn's 10 years of experience in towing

and impound management and consideration of the specific needs of San Francisco, Baltimore County, San Diego and other prospective clients. During the development of ARIES, AutoReturn isolated the development team from other competing tow dispatch platforms, including LETS/TMS. Pendleton averred that although he had used LETS/TMS, neither he nor anyone on the ARIES development team had knowledge of LETS/TMS's internal functions and "inner workings" beyond what can reasonably be deduced from using the software and having a software engineering background. Pendleton stated no part of LETS/TMS was used in developing ARIES and he had "never seen the LETS/TMS source code, object code, database components or any other programming code for LETS and TMS, and [had] no knowledge of any part of LETS and TMS that might be considered a 'trade secret.' "

DTS's opposing evidence included a declaration by Abramson that was substantially the same as his declaration filed in opposition to Orion's motion for summary judgment. Like Orion, AutoReturn and the City objected to Abramson's assertions and suggestions that "Defendants" copied DTS's software as lacking foundation, and the court properly sustained the objections. The exclusion of Abramson's opinion evidence left no evidence raising a triable issue of fact as to whether AutoReturn or the City misappropriated any trade secrets from DTS.

We recognize that Pendleton testified during his deposition that DTS had provided AutoReturn access to DTS's source code with a log-in and password to enable AutoReturn to review the code as part of AutoReturn's "due diligence effort" in connection with discussions about AutoReturn acquiring DTS. Pendleton testified that he

28

did not log into "that passcode," but he provided the passcode to two AutoReturn employees. Only one of those employees, Maxim Glaezer, accessed the source code and reported to Pendleton that he saw "a bunch of files that appeared to be source code" and asked Pendleton what he wanted him to do. Pendleton told the Glaezer it was unnecessary to do anything further because the acquisition was not going to happen and, therefore, there was no need to "go[] through this due diligence exercise." He did not ask Glaezer to make copies of the source code.

Although Pendleton admitted it was possible for him or his employees to have copied the source code, there is no evidence that any such copying occurred. AutoReturn submitted a declaration by Glaezer in which he stated that in early 2009, Pendleton asked him to review and evaluate the LETS/TMS source code as part of due diligence for a potential acquisition, but before he had time to review the code, "DTS and AutoReturn terminated acquisition talks, and DTS rescinded AutoReturn's access to the LETS/TMS code." Glaezer averred that he has never reviewed the code. Pendleton's acknowledgement that it was theoretically possible for AutoReturn employees to have copied DTS's source code is insufficient to raise a triable issue of fact as to whether AutoReturn actually misappropriated a trade secret because it does not imply the existence of misappropriation more likely than the nonexistence of misappropriation, either by itself or together with other inferences or evidence. (*Aguilar, supra,* 25 Cal.4th at p. 857.)

DTS argues that it presented evidence that the City misappropriated DTS's trade secrets within the meaning of section 3426.1 by knowing that DTS's software was

29

confidential material and using it without DTS's approval.   Specifically DTS cites the following paragraph in the declaration of former manager of DTS Sushil Garg:  "From my interactions with various City personnel over the years I understood that the City was aware that DTS's software was required to be kept confidential.  It was my intent as manager of DTS that the City have the same confidentiality obligations relating to DTS software as AutoReturn had under the San Francisco Agreement and Baltimore Agreement.  AutoReturn and the City were exposed to the structure of DTS's software every time they used DTS's programs.  Furthermore, AutoReturn was provided source code and script on a need to know basis.  However, it was understood that AutoReturn and the City were to keep DTS's information confidential."

DTS also cites the following paragraph in Estes's declaration:  "DTS and AutoReturn also agreed that the City of San Diego would be permitted to operate the LETS software as a 'User,' as the term is defined in the Definition section of the San Francisco Agreement.  As a User, the City was to be provided limited security access (i.e.[,] password protected) for use by specified personal [*sic*] on a 'need to know' basis only, and for use solely related to performance of the City's tow communications contract with AutoReturn.  Furthermore, the City understood it was not to share the contents of DTS's software with any prospective competitors of DTS.  While DTS has disclosed portions of its reasons codes and hold reasons databases to the public for marketing purposes, it has not disclosed the majority of these databases as I have been advised AutoReturn contends.  Furthermore, contrary to AutoReturn's assertions, the contents of the reasons codes database, holds reasons database and beat or district database were not

30

'nearly all' derived from public materials or documents provided from the City. While much of the information was publically available, DTS also had to conduct extensive interviews with City employees and other research to collect and compile the information needed for these databases. Moreover, while the information contained in the administrative fee database consists of public information, aggregation of this information took time and effort on DTS's part."

The trial court sustained AutoReturn and the City's objections on the ground of lack of foundation to Garg's statements that he understood the City was aware that DTS's software was required to be kept confidential, that AutoReturn was provided source code and script on a need to know basis, and that "it was understood that AutoReturn and the City were to keep DTS's information confidential." The court also sustained AutoReturn and the City's foundation objections to Estes's statements that the City understood it was not to share the contents of DTS's software with any prospective competitors of DTS, and that " 'contrary to AutoReturn's assertions, the contents of the reasons codes database, holds reasons database and beat or district database were not "nearly all" derived from public materials or documents provided from the City.' " The court's sustaining the foundation objections to Garg's and Estes's assertions about what the City understood was not an abuse of discretion.

In any event, evidence that use of DTS's software by the City was password protected and that City employees understood the software was to be kept confidential does not support a reasonable inference that City employees misappropriated any trade secret aspect of the software. DTS acknowledges that the databases it identifies as trade

31

secrets are, in DTS's words, "largely comprised of public information." DTS argues that the trade secret aspect of the databases is "how these specific databases operate to correlate complex sets of information and make those correlated data sets generate results. . . . [H]ow the data bases interrelate to pull information, query users for more information, and generate results based on data sets is the 'flow of control['] trade secret."[10] Even if there were substantial evidence that the City, through unspecified employees, understood that DTS's software was required to be kept confidential, there is no evidence that any agent of the City had sufficient knowledge and understanding of DTS's claimed "flow of control" secrets to be able to misappropriate them. The court properly ruled that there was no evidence "implicating the City in any misappropriation."

The court did not err in summarily adjudicating DTS's cause of action for misappropriation of trade secrets in the City and AutoReturn' favor.

---

[10] In its second amended trade secret statement under Code of Civil Procedure section 2019.210, DTS stated the following under the heading, "Flow of control trade secrets:" "The static information in the [specified trade secret] databases is valuable in and of itself, but of greater value in any automated system is the way in which that information is used. The data in each of the databases . . . also controls both the functioning of the program and the flow of information. Each new data entry triggers different parts of each database and directs both the program and its users to do different things. The database can direct the program to ask the users for additional information, transmit information to a third party, or direct the users to take specific courses of action outside the confines of the program. Because each combination of instances can trigger a different set of directions, the number of different direction sets is enormous. DTS contends that each possible combination is a trade secret that has been misappropriated by Cross-Defendants and is at issue in this litigation. Each instruction set which translates a combination of inputs into a concrete course of action represents a use of the underlying data and is therefore a trade secret distinct from the trade secret claimed in the static databases. [¶] . . . In the present case, DTS alleges the Cross-Defendants misappropriated both the static data and the dynamic flow of control or instruction sets."

II.  *Denial of DTS's Motion for Reconsideration*

DTS contends the court abused its discretion in denying DTS's motion for reconsideration of the order granting AutoReturn and the City's motion for summary judgment.  Code of Civil Procedure section 1008, subdivision (a) provides that "any party affected by [an] order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order."  "The party seeking reconsideration must provide not just new evidence or different facts, but a satisfactory explanation for the failure to produce it at an earlier time. . . .  A trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard."  (*Glade v. Glade* (1995) 38 Cal.App.4th 1441, 1457.)

DTS moved for reconsideration based on the "newly discovered fact" that AutoReturn did not produce relevant components of its ARIES software for inspection by DTS's computer science expert Abramson.  Specifically, DTS complained that AutoReturn failed to provide access to the maintenance section of the ARIES software, and that without access to maintenance screens, DTS could not determine whether AutoReturn copied significant portion of DTS's software.

In opposition to DTS's motion, AutoReturn and the City noted that after amending its cross-complaint to allege misappropriation of trade secrets, DTS obtained over 40,000 pages of documents from the cross-defendants, took six depositions, and demanded a five-day review of ARIES by its software expert.  Pendleton and AutoReturn's counsel

33

submitted declarations stating that the parties agreed that DTS's expert Abramson's access to ARIES would be limited to the portions of the software that a typical user would see, with DTS reserving the right to seek greater access if it deemed it reasonably necessary. AutoReturn complied with the agreement and provided Abramson full user-level access, which included all of the ARIES maintenance screens. Abramson conducted his review over a period of five days, before DTS filed its opposition to AutoReturn and the City's summary judgment motion. At one point he requested a link to the ARIES administrative module and AutoReturn provided the link. DTS never requested additional access to ARIES or indicated that the access it was provided was inadequate. DTS did not refer to its review of ARIES in its opposition to AutoReturn and the City's motion for summary judgment.

AutoReturn asserted that DTS's motion for reconsideration was based on the incorrect assumption that the ARIES software contained similar maintenance screens to those in DTS's software. AutoReturn contended that "ARIES does not manage its data in the same way as DTS, and has just a handful of maintenance screens, unlike the dozens of screens in DTS's software." AutoReturn and the City requested sanctions against DTS for bringing a frivolous motion for reconsideration.

The court denied the motion for reconsideration, ruling that "DTS had ample time and opportunity to conduct discovery necessary to establish its trade secret claim. It received 40,000 pages of documents, took numerous depositions, and was granted wide access to the ARIES software." The court concluded that DTS failed "to demonstrate legally cognizable 'new or different' facts [or] circumstances,' as the moving papers do

34

not provide a satisfactory explanation for failing to present the information at or before the [summary judgment] hearing or other indicia of reasonable diligence." The court denied AutoReturn and the City's request for sanctions. Given the evidence that before DTS filed its opposition to the AutoReturn and the City's summary judgment motion, AutoReturn provided DTS full user-level access to the ARIES software in accordance with the parties' agreement, including access to ARIES maintenance screens, the court did not abuse its discretion in denying DTS's motion for reconsideration based on AutoReturn's alleged failure to produce ARIES maintenance screens.

III. *Denial of DTS's Motions to Redact and Seal Its Proprietary Information*

DTS contends the court erred in denying five motions that DTS brought under section 3426.5 to redact and seal its proprietary information. None of the parties responding to DTS's appeal have addressed this assignment of error. We agree that the court erred in denying the motions.

On June 4, 2012, DTS sought an order under section 3426.5 to redact and seal verbatim quotes of two of its interrogatory responses that were filed conditionally under seal with AutoReturn and Orion's summary judgment motions. The court denied this sealing motion as a motion under California Rules of Court, rule 2.550. The court found it was tardy under rule 2.551(b)(3)(B). The court acknowledged that DTS sought to seal under section 3426.5, but ruled that section 3426.5 did not apply, stating: "This theory was undermined with the withdrawal of the trade secret claims from the main action, as evidenced by paragraph 6 of the Carey Declaration filed May 25[, 2012]. DTS claims

35

this is still a viable theory as the sixth count of the second amended cross-complaint . . . still contains such a claim."

The court ruled that "DTS has failed to substantiate its claim that the lodged documents will disclose a trade secret, and has failed to make a showing justifying the sort of express and detailed findings necessary under [California Rules of Court, r]ule 2.550(d) if the presumption of [r]ule 2.550(c) is to be overcome." Accordingly, the court denied DTS's sealing request and ordered the clerk to unseal all documents lodged provisionally under seal. However, the court stayed that portion of the order for 30 days.

On June 29, 2012, DTS filed two additional motions to seal. One of those motions requested to redact and seal the following documents filed conditionally under seal in connection with AutoReturn's and the City's summary judgment motion: (1) Exhibits 1 through 5 to its second amended trade secret statement under Code of Civil Procedure section 2019.210, (2) portions of attorney Matthew Yan's declaration, (3) portions of AutoReturn and the City's points and authorities in support of their summary judgment motion, and (4) portions of AutoReturn and the City's separate statement.

DTS's other motion filed on June 29 requested to redact or seal the following documents filed conditionally under seal in connection with Orion's summary judgment motion: (1) seal Exhibits 1 through 5 to its second amended trade secret statement under Code of Civil Procedure section 2019.210, (2) seal DTS's XML schema (DTS's Exh. 6), (3) redact Orion's XML schema represented in July 10, 2010 e-mail from Miller to Hendry (DTS's Exh. 7), (4) seal DTS's summary judgment opposition exhibits 8 through 27, (5) redact Abramson's opposition declaration at paragraphs 21 and 22.

36

The court denied these sealing requests on September 4, 2012, stating: "The court finds, as it did [in ruling on DTS's first sealing motion], that DTS has failed to substantiate its claim that the lodged documents will disclose a trade secret, and has failed to make a showing justifying the sort of express and detailed findings necessary under [California Rules of Court, r]ule 2.550(d) if the presumption of [r]ule 2.550(c) is to be overcome. The court incorporates fully its detailed findings in part 2 of the July 6 minutes." The court again ordered the clerk to unseal all documents lodged provisionally under seal, but stayed that portion of the order because it was aware that DTS had appealed the court's previous order denying DTS's motion to seal. The court assumed DTS would also appeal the second order denying its sealing requests and stated: "The stay will expire if DTS does not file a timely notice of appeal on this issue."

DTS's fourth motion to seal was an ex parte application on September 13, 2012, that again sought to fully redact and seal its summary judgment opposition exhibits 6 through 27 and to redact specified portions of Abramson's opposition declaration, and to redact and seal certain documents it submitted in opposition to Orion's motion for attorney fees, including portions of a declaration by Abramson. The court denied DTS's requests to seal and redact, but again stayed the unsealing of the conditionally sealed documents "pending the appellate decision."

DTS's fifth request to seal was an ex parte application in December 2012 to seal documents filed in support of AutoReturn and the City's motion for attorney fees and costs. Specifically, DTS sought to seal an exhibit "O," which consisted of excerpts from the deposition transcript of DTS employee Reba Hildebrand and to file a copy of the

exhibit with specified redactions.  DTS also sought to seal all of AutoReturn and the City's exhibit "P," which was previously an exhibit to Hildebrand's deposition.  The court again denied the application but stayed the unsealing.

The court erred in applying California Rules of Court, rule 2.550 to DTS's requests to seal instead of section 3426.5, which provides:  "In an action under this title, a court shall preserve the secrecy of an *alleged* trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval."  (Italics added.)  California Rules of Court, rules 2.550 and 2.551 regarding sealed records "do not apply 'to records that courts must keep confidential by law.' "  (*In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 298 (*Providian*).)  A mandatory confidentiality requirement is imposed only in actions for misappropriation of trade secrets under the UTSA.  (*Providian*, at p. 298.)

As the plain meaning of section 3426.5 and *Providian* make clear, because DTS was prosecuting an action for misappropriation of the alleged trade secrets under the UTSA, it was entitled to file its alleged trade secret material under seal to preserve its secrecy.  DTS has not been prejudiced so far by the court's denials of its requests to seal because all of the documents that DTS sought to seal or redact were filed conditionally under seal and remain under seal as a result of the trial court's staying their unsealing pending this appeal.  Because DTS claims the right to trade secret protection under section 3426.5 and we have affirmed summary adjudication of its statutory trade secret

cause of action solely based on lack of evidence of misappropriation and not on the ground there is no trade secret, DTS is entitled to maintain the material in question under seal. Accordingly, we will reverse the orders denying DTS's requests to seal and direct the court to grant those requests.

IV. *Attorney Fee Awards Under Section 3426.4*

DTS contends the trial court erred in awarding attorney fees to Orion and AutoReturn under section 3426.4.[11] Section 3426.4 provides: "If a claim of misappropriation is made in bad faith, . . . the court may award reasonable attorney's fees and costs to the prevailing party. Recoverable costs hereunder shall include a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party."

" 'Although the Legislature has not defined "bad faith" ' for purposes of section 3426.4, 'our courts have developed a two-prong standard: (1) objective speciousness of the claim, and (2) subjective bad faith in bringing or maintaining the action, i.e., for an improper purpose.' " (*Cypress Semiconductor Corp. v. Maxim Integrated Products, Inc.* (2015) 236 Cal.App.4th 243, 260 (*Cypress*), quoting *FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1275 (*FLIR*).) "Objective speciousness is said to be present 'where the action superficially appears to have merit but there is a complete lack of

---

11     Although the court awarded attorney fees and costs to AutoReturn and the City jointly, DTS's challenge on appeal to that award addresses only the propriety of the award as to AutoReturn.

39

evidence to support the claim.' [Citation.] The first clause, of course, is superfluous; there is no logical reason to require that the action 'superficially appear[ ] to have merit.' " (*Cypress, supra,* at p. 261.) "Subjective bad faith may be inferred by evidence that appellants intended to cause unnecessary delay, filed the action to harass respondents, or harbored an improper motive. [Citation.] The timing of the action may raise an inference of bad faith. [Citation.] Similar inferences may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel." (*FLIR, supra,* at p. 1278.)

"An award of attorney fees for bad faith constitutes a sanction [citation], and the trial court has broad discretion in ruling on sanctions motions. [Citation.] 'Assuming some evidence exists in support of the factual findings, the trial court's exercise of discretion will not be disturbed unless it exceeds the bounds of reason. [Citation.] [¶] In reviewing the facts which led the trial court to impose sanctions, we must accept the version thereof which supports the trial court's determination, and must indulge in the inferences which favor its findings.' " (*Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1262-1263 (*Gemini*).) Thus, on an appeal from an order under section 3426.4, "the appellant has an 'uphill battle' and must overcome both the 'sufficiency of evidence' rule and the 'abuse of discretion' rule. . . . We do not retry cases on appeal and we do not substitute our discretion for that of the trial court." (*FLIR, supra,* 174 Cal.App.4th at pp. 1275-1276.)

"A defendant moving for attorney fees under section 3426.4 is 'not required to conclusively prove a negative (i.e., that they did not steal [the plaintiff's] trade secrets).

40

Instead, under the "objectively specious" standard, it [i]s enough for defendants to point to the absence of evidence of misappropriation in the record.' [Citation.] Further, the sufficiency of the evidence to support a given finding is not tested solely by examining evidence presented by one party, but raises the question whether '*on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . . [W]hen two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.' " (*Cypress, supra,* 236 Cal.App.4th at p. 260.)

*Attorney fee award to Orion*

We conclude substantial evidence supports the trial court's determination that DTS maintained its trade secret claim against Orion in bad faith. Accordingly, we conclude the court did not exceed the bounds of reason in awarding Orion attorney fees under section 3426.4 as a sanction against DTS. Although the trial court did not expressly state that DTS's trade secret claim was "objectively specious," the court expressly noted in its order that " 'bad faith' as used in section 3426.4 consists of both 'objective speciousness' of the plaintiff's claim and 'subjective bad faith in bringing or maintaining the claim.' " In ruling on Orion's motion for attorney fees, the court stated: "As foreshadowed by the court's . . . ruling on the DeLatte/Orion motion for summary judgment, DTS's decision to drag them into the case was made without any admissible evidence (as opposed to rumor and suspicion) of any wrongdoing by them, and was thus *objectively unreasonable and in bad faith*." (Italics added.) Regarding subjective bad faith, the court ruled: "And there is more than a little evidence, outlined in [Orion's] moving and reply papers, to suggest that

41

[DTS's] decision to file the cross-action was also made for an improper purpose, and that the cross[-]action was thereafter maintained for an ulterior purpose by DTS long after it should have been clear that DeLatte and Orion had no liability."

During oral argument on the attorney fee motions, DTS's counsel equated "objective bad faith" with "objective speciousness," arguing: "Orion has failed to meet its burden of proof by a preponderance of the evidence. They are required not just to show subjective bad faith, *but also to show objective bad faith*. And the court doesn't specifically address that in its tentative." (Italics added.) The court disagreed, stating, "I specifically say [in the written order] 'and was thus objectively unreasonable and in bad faith,' so you are starting off on the wrong foot. I did make a ruling on that." (Italics omitted.) Thus, the court clarified that the word "objectively" in its written order modified both "unreasonable" and "bad faith." Taking our cue from DTS's counsel and the trial court, we construe "objective bad faith" to mean the same as "objective speciousness" for purposes of Orion's motion for attorney fees under section 3426.4.[12]

Bearing in mind that we must accept the version of the facts that supports the trial court's determination, if supported by substantial evidence, and must indulge in the inferences that favor the court's findings (*Gemini, supra,* 95 Cal.App.4th at pp. 1262-1263), we conclude the trial court reasonably found that DTS's trade secret claim against

---

[12]     Later during oral argument, DTS's counsel again equated objective bad faith with objective speciousness, stating: "Your Honor, for purposes of ruling on this motion, the issue with regard to objective bad faith is whether there is any evidence that supports the filing of this [trade secret] claim."

both Orion was objectively specious and subjectively maintained in bad faith. Orion

submitted a declaration by its counsel (Kenneth Fitzgerald), with supporting e-mails and

other documentation, recounting negotiations between him and DTS's counsel (Mark

Bailey) and ACT's counsel (Patrick Webb) regarding Orion's request to be dismissed

from DTS's and ACT's lawsuits. Bailey and Webb informed Fitzgerald that "they had

sued Orion to dissuade Orion from moving forward in San Diego, and their hope was that

without Orion's participation in the project, AutoReturn would not be able to meet the

City's [towing] needs, and the City would drop AutoReturn as its vendor." Orion rejected

certain settlement demands by ACT and DTS[13] and decided to proceed with the

litigation and produce all documents requested by DTS with the view that "DTS would

see that none of its source code or trade secrets were provided to or used by Orion, and

that DTS would then voluntarily dismiss Orion from the action."

In ensuing e-mail exchanges, Fitzgerald repeatedly requested that DTS dismiss

Orion from its lawsuit based on the absence of any evidence that Orion had

---

[13]     Bailey told Fitzgerald that DTS and ACT would be willing to dismiss Orion from the litigation if DeLatte provided a predeposition interview with Bailey and if Orion provided an informal production of its documents. Orion agreed to those terms, but was unwilling to produce documents and disclose information that would violate a confidentiality agreement between Orion and AutoReturn. However, Orion agreed to produce documents that would potentially violate the confidentiality agreement if DTS would subpoena them. Rather than subpoena the documents, DTS proposed that Orion assign to DTS claims it might have against AutoReturn so that Orion and DTS would be in privity and could therefore share AutoReturn's confidential information. DTS also suggested that Orion did not have to comply with its confidentiality agreement because AutoReturn had breached the agreement by not disclosing the present litigation to Orion.

43

misappropriated DTS's trade secret.  Fitzgerald asserted that the documents Orion produced in discovery showed that Orion and DeLatte "did not receive any source code or other arguably proprietary information belonging to [DTS or ACT], and they certainly were unaware of any possible proprietary status of any information they did receive in the course of their dealings with AutoReturn. . . .  [¶] There is no factual basis for the allegations that [Orion] misappropriated [DTS's or ACT's] trade secrets . . . .  The continued prosecution of this action against [Orion] makes no sense, and is in bad faith. There is no legitimate reason that my clients remain parties to this case.  Please dismiss them immediately."

Before incurring the expense of preparing Orion's summary judgment motion, Fitzgerald again asked DTS to dismiss Orion from its lawsuit and gave DTS notice that Orion would seek sanctions under section 3426.4 if it were not dismissed.  After receiving a message from DTS's counsel asking Orion to identify documents that exonerated Orion from DTS's trade secret misappropriation claim, Fitzgerald pointed out: "I'm afraid you have things reversed.  It is not [Orion's] burden to prove a negative, that is, the absence of theft.  It is your burden to prove there was theft.  In [Orion's] document production there is no transmittal of code, no transmittal of your client's information, and no communication that reflects any copying or transmission of [DTS's] information. There is no evidence of trade secret theft because there was no trade secret theft.  If you think I am mistaken, please identify the documents you believe show that [DTS's] trade secrets were stolen."  DTS did not identify documents or other evidence of trade secret

44

misappropriation by Orion and Orion successfully moved for summary adjudication of DTS's trade secret cause of action.

DeLatte filed a declaration in support of Orion's motion for attorney fees in which she recounted a number of conversations with DTS officer Morgan Hill in which Hill promised to dismiss Orion from DTS's lawsuit. DeLatte agreed to be interviewed by DTS's counsel in exchange for a dismissal, but DTS never dismissed Orion from the case. DeLatte declared: "I tried to do everything possible to obtain a dismissal from this lawsuit, starting with the decision to withdraw from the San Diego project. Then, I agreed to cooperate, to the extent I lawfully could, to provide information to DTS, and to provide a deposition in San Diego if Orion would be dismissed. Orion and I provided all of the discovery requested of us, in the hopes that the parties would see from this discovery that Orion had done nothing wrong, and did not belong in this lawsuit."

In a reply declaration, DeLatte stated that Hill had told her on a number of occasions that his lawyers said they had to sue her in order to obtain her cooperation. Delatte told Hill he did not have to sue her to get information; he could simply take her deposition. Hill said that he did not know he could depose someone without suing them, and that he would talk to his lawyers and get them to dismiss Orion. DeLatte averred that Hill's statement in his opposition declaration that DeLatte told him AutoReturn had provided her with DTS's data and other information was "completely false," and that AutoReturn never provided her with any DTS data.

Based on Orion's evidence, the court could reasonably find that DTS's trade secret claim against Orion was objectively specious and brought in subjective bad faith—i.e.,

45

for the improper purpose of dissuading Orion from moving forward in San Diego in the hope Orion's withdrawal from the project would cause the City to drop AutoReturn as its towing contractor.

DTS contends the court's bad faith finding was improperly based on statements by DTS's and ACT's counsel that the court should have excluded from evidence under Evidence Code sections 1152[14] and 1154[15] as statements made during settlement negotiations between Orion, DTS, and ACT. The court rejected that argument in its order, stating: "The information [in Fitzgerald's declaration] is not offered to show liability or damage but rather is offered to show the presence or absence of good faith."

The trial court's consideration of statements made by DTS's counsel during settlement negotiations was not an abuse of discretion. Evidence Code sections 1152 and 1154 do not absolutely bar admission of evidence of settlement negotiations; such evidence "may be admissible for a purpose other than proving liability[,]" including proving bad faith. (*Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1491; *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 887

---

[14] Evidence Code section 1152, subdivision (a), provides: "Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."

[15] Evidence Code section 1154 provides: "Evidence that a person has accepted or offered or promised to accept a sum of money or any other thing, act, or service in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove the invalidity of the claim or any part of it."

[Evidence Code section 1152 does not preclude evidence of settlement negotiations that is offered to prove an insurer's bad faith rather than liability for the original loss or damage.].)  The court properly considered statements by DTS's counsel during settlement negotiations in determining whether DTS acted with subjective bad faith in suing Orion for misappropriation of trade secrets.  DTS's counsel's statements are admissible against DTS under the rule that "[s]tatements made by agents authorized to act on behalf of a party are admissible against that party."  (*Volkswagen of America, Inc. v. Superior Court, supra,* 139 Cal.App.4th at p. 1492.)

DTS complains that the court considered only Orion's evidence in ruling on the motion for attorney fees and did not consider Hill's declaration, which DTS contends is the only direct evidence of DTS's subjective state of  mind.  We assume in support of the judgment that the court considered DTS's evidence and found Orion's evidence more credible on the issue of whether DTS maintained its trade secret claim against Orion in bad faith.  As noted, we must accept the version of the facts that supports the trial court's determination.  (*Gemini, supra,* 95 Cal.App.4th at pp. 1262-1263.)

Hill's opposition declaration contains his recounting of settlement negotiations with Orion (DeLatte and Fitzgerald) and his assessment of why the negotiations were unsuccessful, but it does not compel a finding that Hill reasonably thought that Orion had misappropriated DTS's alleged trade secrets.  Hill averred that software engineers had advised him "that it simply was not possible to create a complex software system such as DTS's from whole cloth[,]" and that the only way to develop such a system in a short time was to copy DTS's existing system.  Thus, Hill concluded it was likely that Orion

47

and AutoReturn were copying DTS's proprietary information "with the City's help in providing access." Hill stated: "I was advised that Orion did not need to see DTS's source code to perpetrate this copying, and in fact viewing DTS's source code would be a slow and ineffective way to steal DTS's proprietary information. It would be much more effective . . . for Orion [and AutoReturn] to simply look at LETS [and TMS] and copy how it was set up and the data that was contained on the system. This *readily viewable* information took DTS years to configure and compile so that it was optimally useful by the City." (Italics added.) Based on these statements by Hill, the court could reasonably find that DTS merely *suspected* AutoReturn and Orion of copying only "readily viewable" information that was not *trade secret* information–a finding that supports the court's conclusion that DTS had no evidence that Orion or AutoReturn misappropriated a trade secret and that DTS did not maintain its trade secret claim against Orion and AutoReturn in subjective good faith.

The court did not abuse its discretion in awarding Orion attorney fees under section 3426.4.

*Attorney fee award to AutoReturn*

We conclude that substantial evidence also supports the trial court's determination that DTS maintained its trade secret claim against AutoReturn in bad faith within the meaning of section 3426.4. In ruling on AutoReturn's motion for attorney fees, the court found that the "trade secret counts" in this case were "specious" and that "ACT's and DTS's decision to drag [the] City and AutoReturn into the case was made without any admissible evidence (as opposed to rumor and suspicion) of any wrongdoing by the City

48

and AutoReturn, and was thus objectively unreasonable and in bad faith." The court further stated that "DTS fail[ed] to offer any evidence that its trade secret claims were objectively reasonable, instead regurgitating arguments rejected in the prior summary judgment/adjudication motions." Regarding subjective bad faith, the court ruled that "DTS fail[ed] to address or dispute any of the evidence that it acted with subjective bad faith and engaged in gamesmanship." The court noted that DTS "prosecut[ed] its claims against the City and AutoReturn for several months even though an identical claim against DeLatte/Orion was dismissed by summary judgment on July 6, 2012." The court concluded that "without any evidence in support of its trade secrets claim, DTS litigated and pursued this action against the City and AutoReturn without any good faith basis for believing that a trade secret theft had taken place."

As noted, under the "objectively specious" standard, it is enough for a defendant to a trade secret claim to point to the absence of evidence of misappropriation in the record (*Cypress, supra,* 236 Cal.App.4th at p. 260.) Accordingly, the court reasonably based its finding of objective speciousness on its prior determination on summary judgment that DTS presented "no material evidence of actual misappropriation"—i.e., that there was insufficient evidence to raise a material issue of fact as to whether AutoReturn misappropriated a trade secret.

Hill's declaration in opposition to AutoReturn's motion for attorney fees was similar to his declaration in opposition to Orion's motion. Hill stated that "the only means that DTS had to determine whether AutoReturn was in fact copying DTS's proprietary software was to file suit." This statement supports the court's finding that the

49

suit was filed based on *suspicion* rather than evidence of trade secret misappropriation. Hill mentioned DTS's discovery that Orion was in possession of DTS's XML schema and reason code information, but Abramson's declaration filed by DTS in opposition to summary judgment motions did not identify those as trade secrets; Abramson merely speculated that because they had been copied, the copying "likely" extended to trade secret information. Hill's declaration reiterated statements in his prior declaration regarding Orion and AutoReturn's suspected copying of "readily viewable" LETS/TMS information that "took DTS years to configure and compile so that it was optimally useful by the City." As we discussed, these statements reasonably support a finding that DTS merely *suspected* AutoReturn and Orion of copying "readily viewable" information that was not *trade secret* information. The court could reasonably find DTS's trade secret claim against AutoReturn was objectively specious based on the lack of evidence that AutoReturn misappropriated a trade secret. The court could reasonably find subjective bad faith based on DTS's continuing to prosecute the claim "after [its] fatal shortcomings [were] revealed by opposing counsel[,]" as well as the court's prior ruling on Orion's summary judgment motion. (*FLIR, supra,* 174 Cal.App.4th at p. 1278.)

The court did not abuse its discretion in awarding AutoReturn attorney fees under section 3426.4. In light of our affirmance of the attorney fee award to AutoReturn under

section 3426.4, we need not address AutoReturn's argument that it is, alternatively, entitled to attorney fees under section 1717 as a prevailing party in a contract dispute.[16]

V. *Summary Adjudication of Cause of Action for Breach of Joint Venture Agreement*

DTS contends the court erred in summarily adjudicating its cause of action for breach of joint venture agreement in AutoReturn's favor. In its fifth cause of action for breach of joint venture agreement, DTS alleged that DTS and AutoReturn "teamed up and entered into an oral and/or implied joint venture agreement in order to jointly submit a bid for the 2008 RFP to provide dispatch communications services to the City and the City's tow contractors. Under the joint venture, AutoReturn and [DTS] agreed to use [DTS's] LETS, TMS, . . . and other communications and integration software and hardware to fulfill the requirements of the 2008 RFP." DTS further alleged that AutoReturn breached the "joint venture agreement by terminating [DTS's] responsibilities under the 2008 RFP, and contracting to have those services performed by Orion, or performing [DTS's] responsibilities under the joint venture in house . . . ."

" 'A joint venture . . . is an undertaking by two or more persons jointly to carry out a single business enterprise for profit.' [Citation.] 'There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must

16    AutoReturn contends it was a prevailing party in its licensing agreements with DTS because, in AutoReturn's words, "DTS's trade-secret claim against AutoReturn was (and still is) premised largely on these 'two agreements that required AutoReturn to keep DTS's software confidential.' "

each have an ownership interest in the enterprise.  [Citation.]'  [Citation.]  'Whether a joint venture actually exists depends on the intention of the parties.  [Citations.] [¶] . . . [¶] . . . [W]here evidence is in dispute the existence or nonexistence of a joint venture is a question of fact to be determined by the jury.' "  (*Unruh-Haxton v. Regents of the University of California* (2008) 162 Cal.App.4th 343, 370.)

In its motion for summary judgment, AutoReturn, presented declarations of its CEO, Wicker, and chief technology officer, Pendleton.   Both averred that DTS did not form a joint venture with AutoReturn and did not share profits, control, or ownership of a separate entity with AutoReturn.  Pendleton declared that at all times, AutoReturn considered DTS to be a vendor and that the parties never discussed forming a joint venture.  Wicker stated that AutoReturn considered DTS to be a subcontractor, as it had in all of its prior dealings with DTS.  The parties contemplated the same type of licensing arrangement they had in San Francisco and Baltimore County—i.e., DTS would provide software and technical support for the software in return for AutoReturn's payment of a fee.

DTS's opposition evidence included deposition testimony and declarations from Estes and Garg.  Estes testified that in the spring of 2008, DTS and AutoReturn entered into an oral "global joint venture agreement," which they intended to later put in writing. The parties agreed to "jointly propose deals for prospective clients and share in the revenue and the costs."  Estes initially testified that the parties agreed to percentages of revenue they would share, but he did not recall the specific percentages and did not know where to find "that number."   However, later in his deposition Estes testified that

52

AutoReturn and DTS agreed to share gross profits on a "pro rata" or percentage basis with a "60/40"split, meaning that AutoReturn would receive 60 percent and DTS would receive 40 percent of the gross profits. At the hearing on AutoReturn and the City's summary judgment motion, AutoReturn's counsel represented that Estes recalled the 60/40 profit percentages after having lunch with his counsel.

In his declaration, Estes averred that in the spring of 2008 "AutoReturn and DTS entered into an oral joint venture agreement to jointly pursue municipal contracts throughout the United States" and that he personally negotiated the agreement with AutoReturn's principals, including Wicker and Pendleton. Under the joint venture agreement, DTS and AutoReturn agreed to share the profits and losses associated with pursuing each contract, with the parties sharing joint control over the business of the venture. Regarding profit sharing, Estes declared: "During my deposition in this case, I was asked what the compensation structure was for the joint venture arrangement with AutoReturn in San Diego. At that time I could not recall the figure, but since my deposition I have been able to refresh my recollection and recall that we agreed to split the $22.00 per-tow fee for City authorized tows in San Diego at 60% AutoReturn and 40% DTS."

Garg testified in his deposition that DTS had "pretty vast discussions with AutoReturn about a joint venture relationship which centered around the San Diego contract being in the RFP stage. We had talked about over time . . . having a closer joint venture whereby [AutoReturn] would go out and become . . . an exclusive marketing arm for DTS to go market. [DTS would] do all the development and [AutoReturn would] do

53

all the marketing, and that would be the nature of a joint venture." Garg testified that he sold DTS before the joint venture agreement was finalized, but DTS and AutoReturn reached an "agreement in principle" and "clear understanding" regarding how the joint venture relationship would be structured for San Diego. The parties agreed that DTS would assist AutoReturn in the RFP process, and would work with AutoReturn "to provide whatever they needed to get the response and work with the City to let them know that they are [DTS's] partner in this process, and in return, when they get the contract, [DTS gets] a split of the revenue and provide[s] all the software services." DTS expected "[a] percentage split of the revenue" and agreed to AutoReturn's receiving 60 percent and DTS's receiving 40 percent.

In AutoReturn and the City's reply to DTS's opposition to the summary judgment motion, AutoReturn asserted that DTS's joint venture claim was based entirely on Estes's declaration and that the court should strike the declaration because of DTS's discovery abuse regarding Estes's deposition. AutoReturn contended that DTS had refused to produce Estes to complete his deposition despite a court order.

Although the court overruled AutoReturn and the City's four evidentiary objections that were directed at the portions of Estes's declaration regarding AutoReturn and DTS's joint venture agreement, in its order granting the motion for summary judgment, the court struck Estes's entire declaration. The court stated:

> "DTS has not created a triable issue of fact as to the joint venture claim, count 5. The key declarant in opposition to the motion as to count 5 is Lawrence Estes. Much of the Estes declaration is inadmissible, and that which does not run afoul of the Evidence Code is a classic sham declaration. The key passage of the

54

Declaration is in paragraph 14 on page 5. Estes admits that when deposed he 'could not recall' the <u>key element</u> of the joint venture, the 'compensation structure.' He then purports to testify in the Declaration that 'since [his] deposition, I have been able to refresh my recollection.' <u>He never states by what means he was refreshed</u>. There were several other instances of Mr. Estes not recollecting important information . . . , at least until after the lunch break . . . . During argument, counsel for DTS tacitly acknowledged he could not have been refreshed by a document, as there are no documents which reflect the existence of the purported 'joint venture.' "

Regarding Estes's deposition testimony that AutoReturn and DTS agreed to share gross profits on a percentage basis with a 60/40 split, the court stated that "this does not change the result. Contrary to the suggestion at oral argument, this is not a credibility determination, but rather a determination that the referenced testimony is so equivocal in context that it does not raise a triable issue of fact. This is confirmed by the fact that even Estes did not reference it in his own Declaration."

The court struck Estes's entire declaration on the ground it was a "sham declaration," but viewed DTS's discovery abuse regarding Estes's deposition as further support for its decision.[17] The court stated: "The failure of DTS to produce Estes for completion of his deposition until the day before the reply brief was due, despite Judge Denton's order to the contrary and following a series of emails seeking to confirm he would be produced in a timely fashion (which emails went without response), confirms the court's view that the Estes Declaration should be stricken in its entirety."

---

[17]  AutoReturn did not ask the court to strike Estes's declaration on the ground it contradicted his deposition testimony; its request to strike the declaration was based solely on alleged discovery abuse regarding his deposition.

55

DTS contends the court erred in striking Estes's entire declaration. We agree. One of the cases the court cited in its ruling as authority for striking Estes's declaration is *Yeager v. Bowlin* (9th Cir. 2012) 693 F.3d 1076, in which the Ninth Circuit Court of Appeals applied what is referred to in federal case law as the "sham affidavit rule." (*Id.* at p. 1079.) Under that rule, " 'a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.' " (*Van Asdale v. International Game Technology* (9th Cir. 2009) 577 F.3d 989, 998 (*Van Asdale*).)

However, federal cases have "recognized that the sham affidavit rule is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence. Aggressive invocation of the rule also threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys. [The Ninth Circuit has] thus recognized that the sham affidavit rule 'should be applied with caution.' " (*Van Asdale, supra,* 577 F.3d at p. 998.)

There are "two important limitations on a [trial] court's discretion to invoke the sham affidavit rule. First, . . . the rule 'does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony,' [citation]; rather, 'the [trial] court must make a factual determination that the contradiction was actually a "sham." ' [Citation.] Second, . . . *the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit*." (*Van Asdale, supra,* 577 F.3d at pp. 998-999, italics added.)

56

California law regarding "sham declarations" is similar to federal law: "[I]n opposing a summary judgment motion, a plaintiff may not create a disputed issue of fact by contradicting his or her deposition testimony with an affidavit or declaration." (*Jogani v. Jogani* (2006) 141 Cal.App.4th 158, 177, citing *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 20-22 (*D'Amico*).) This rule has been referred to as the *D'Amico* rule. (See *Ahn v. Kumho Tire U.S.A., Inc.* (2014) 223 Cal.App.4th 133, 136, 143-144 (*Ahn*).)[18]

However, like federal courts considering the sham affidavit rule, California courts have cautioned that " 'an uncritical application of the *D'Amico* decision can lead to anomalous results, inconsistent with the general principles of summary judgment law.' . . . *D'Amico* should not be interpreted 'as saying that admissions should be shielded from careful examination in light of the entire record.' [Citation.] This is because the record may contain evidence that credibly contradicts or explains what might appear to be clear and unequivocal admissions, if the admissions are viewed in isolation and without reference to the other evidence." (*Ahn*, *supra*, 223 Cal.App.4th at p. 144, quoting *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 482.) "Courts have consistently refused to apply the *D'Amico* rule to exclude evidence adduced in opposition to a summary judgment motion when either evidence adduced on the motion credibly

---

18      Under the *D'Amico* rule, " ' "[w]here . . . there is a *clear and unequivocal admission* by the plaintiff, himself, in his deposition" ' and the plaintiff contradicts that admission in a subsequent declaration, ' "we are forced to conclude there is no *substantial* evidence of the existence of a triable issue of fact." ' " (*Ahn*, *supra*, 223 Cal.App.4th at p. 144, quoting *D'Amico*, *supra*, 11 Cal.3d at p. 21, first italics added by *Ahn*.)

explains or contradicts a party's earlier admissions." (*Ahn*, *supra*, 223 Cal.App.4th at pp. 144-145.) "A summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence." (*Price v. Wells Fargo Bank, supra,* 213 Cal.App.3d at p. 482.)

Here, the court's decision to strike Estes's entire declaration was, in the words of the *Ahn* court, "an overly broad and erroneous application of the *D'Amico* rule." (*Ahn*, *supra*, 223 Cal.App.4th at p. 136.) The trial court was not presented with a clear and unequivocal admission by Estes in his deposition that was contradicted by his later declaration. In his deposition, Estes initially stated he could not recall the specific profit sharing percentages to which DTS and AutoReturn agreed under their alleged joint venture agreement. Later in the *same deposition* Estes testified that AutoReturn and DTS agreed to a 60/40 split of profits. In his declaration he again stated that the parties "agreed to split the $22.00 per-tow fee for City authorized tows in San Diego at 60% AutoReturn and 40% DTS." Although circumstances may render Estes's credibility on that point suspect, we cannot say that his deposition testimony and declaration averment about the agreement to share profits with a 60/40 split were so contradictory to his earlier testimony that striking his entire declaration under the *D'Amico* or sham affidavit rule was warranted. Estes's initial testimony was more a "fragmentary and equivocal concession[], which [was] contradicted by other credible evidence" (*Price v. Wells Fargo Bank, supra,* 213 Cal.App.3d at p. 482) than a clear and unequivocal admission that was clearly and unambiguously inconsistent with his later testimony and declaration.

58

Notwithstanding the court's assertion in its summary judgment ruling that its decision to strike Estes's declaration was "not a credibility determination, but rather a determination that the referenced testimony is so equivocal in context that it does not raise a triable issue of fact," we view the court's striking Estes's declaration as a credibility determination–i.e., the court determined that Estes's deposition testimony and declaration that the parties agreed to a 60/40 profit split was not credible because he initially testified in his deposition that he could not recall the profit sharing percentages. The court's credibility determination contravenes the *D'Amico* rule because there was no "clear and unequivocal" admission in Estes's deposition that his later declaration contradicted. The credibility determination also contravenes the well-settled rule that in ruling on a summary judgment motion, the court must view the evidence in the light most favorable to the opposing party and resolve any evidentiary doubts or ambiguities in the opposing party's favor. (*Aguilar*, *supra*, 25 Cal.4th at p. 843; *Saelzler, supra,* 25 Cal.4th at p. 768.)

DTS additionally contends that the order striking Estes's declaration constituted an evidence sanction under Code of Civil Procedure section 2023.030, subdivision (c) for misuse of the discovery process, and that the court erred by imposing the sanction without providing the notice and opportunity for hearing required by that statute. We agree that the court's striking the declaration cannot be upheld as a sanction under Code of Civil Procedure section 2023.030 because DTS was not afforded proper notice and opportunity for hearing on the issue. "Code of Civil Procedure section 2023.030, provides for discovery sanctions only 'after notice . . . and after opportunity for hearing'

59

*and* only in the manner 'authorized by the chapter governing any particular discovery method or any other provision of this title . . . .' " (*People ex rel. City of Dana Point v. Holistic Health* (2013) 213 Cal.App.4th 1016, 1030 [seeking potentially dispositive evidentiary sanctions in a summary judgment brief did not satisfy the notice and hearing requirements of Code of Civil Procedure section 2023.030].)  As noted, AutoReturn and the City requested the court to strike Estes's declaration in their reply to DTS's opposition to their summary judgment motion; they did not make that request by noticed motion.

Further, in the absence of a violation of an order compelling an answer or further answer, an evidence sanction may be imposed only where the answer given by a party responding to discovery is willfully false.  (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 334.)  The inconsistency between Estes's initial deposition answer that he did not recall the agreed profit sharing percentages and his later deposition testimony and declaration that AutoReturn and DTS agreed to share gross profits on a percentage basis with a "60/40" split does not establish that Estes's later deposition testimony and declaration were willfully false.  We conclude the court erred in striking Estes's declaration.

DTS presented evidence that raises a triable issue of fact as to the existence of DTS's alleged joint venture agreement with AutoReturn.[19]  As noted, the three basic elements of a joint venture are that the members must jointly control the venture, share

19    The parties' dispute regarding the alleged joint venture is focused entirely on whether there was a joint venture agreement; there is no argument that to the extent there was such an agreement, AutoReturn did not breach it.

60

the profits of the undertaking, and each have an ownership interest in the enterprise. (*Unruh-Haxton v. Regents of the University of California, supra,* 162 Cal.App.4th at p. 370.) "While in a technical joint venture there is usually a sharing of profits and losses in the prosecution of the common enterprise [citation], the mode of participating in the fruits of the undertaking may be left to the agreement of the parties." (*Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 764.)

The deposition testimony of both Estes and Garg, and Estes's declaration, provide substantial evidence that the parties discussed and orally agreed to pursue a joint venture to pursue municipal contracts and to share control and the profits of the venture. Additional evidence of a joint venture is the statement in AutoReturn's proposal that "AutoReturn is pleased to present this proposal with support from DTS as *its technology partner.*" (Italics added.)

AutoReturn argues that there is no evidence of joint control over the alleged joint venture because AutoReturn and DTS each controlled separate aspects of the venture. However, the element of joint control may be satisfied even though the parties to a joint venture delegate control over a particular aspect of the venture to the party who is qualified to perform that aspect. (See *Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 93.) "Although it has been said that joint control of the undertaking and equal power to direct the enterprise is an essential element of a joint venture [citations][,] this is not to say that there cannot be a joint venture where the parties have unequal control of operations. The requirement of authority and control has been construed to mean that while in the absence of special agreement one joint venturer cannot bind the

61

others, 'they may by agreement grant authority to one or more of their number which would not be implied from the relationship alone.' " (*Stilwell v. Trutanich* (1960) 178 Cal.App.2d 614, 619.) DTS and AutoReturn could delegate control of different aspects of the alleged joint venture between themselves according to their respective areas of expertise.

The evidence properly considered raises a triable issue of fact as to whether DTS and AutoReturn entered into a joint venture agreement that AutoReturn breached. The trial court erred in adjudicating DTS's fifth cause of action for breach of joint venture agreement in AutoReturn's favor.

VI. *Denial of Leave to Amend to Plead Causes of Action for Tortuous Interference with Contract and Breach of Fiduciary Duty*

DTS contends that the court erred in denying its motion for leave to file a third amended cross-complaint on the ground that statutory CUTSA supersession barred DTS's proposed cross-claim against AutoReturn for breach of fiduciary duty and cross-claim against Orion for tortuous interference with contract. DTS's contention mischaracterizes what happened in the trial court.

DTS filed a motion for leave to file a third amended cross-complaint that would add a cause of action of for breach of fiduciary duty against AutoReturn. The motion created a procedural muddle. AutoReturn filed a "Statement of Non-Opposition" to DTS's motion, in which it stated that it did not oppose the motion but did "not concede any of the merits, allegations, or causes of action alleged in the Motion or in the proposed Third Amended Cross-Complaint." In its opening brief, DTS asserts that its motion to

62

amend also sought to add a cause of action against Orion for tortuous interference with contract. However, DTS's operative *second* amended cross-complaint already contained an eighth cause of action against Orion for interference with contractual relations that had not been dismissed when the court ruled on Orion's motion for summary judgment against DTS. DTS's second amended cross-complaint also contained a 10th cause of action for interference with contractual relations against the City. AutoReturn and the City demurred to the 10th cause of action (and other causes of action) on the ground it was superseded by DTS's sixth cause of action for misappropriation of trade secrets under the CUTSA, which DTS brought against AutoReturn, the City, Orion, and DeLatte. *Orion did not file a demurrer to DTS's second amended cross-complaint.* The court (Judge William R. Nevitt, Jr.) sustained AutoReturn and the City's demurrer to the 10th cause of action without leave to amend on the ground the CUTSA superseded that cause of action because it was "based on the same nucleus of facts as the sixth . . . cause of action [for misappropriation of trade secrets]."

In denying DTS's motion to file its proposed third amended cross-complaint, the court (Judge Taylor) noted in its minute order that Judge Nevitt had "previously sustained a demurrer, holding that DTS's claims for common law misappropriation, interference with contract and contractual relations, and undue business practices were superseded by DTS's [statutory] claim for Misappropriation Of Trade Secrets . . . , as all of these claims were premised on a common nucleus of fact relating to alleged misuse of DTS's software." Judge Taylor's minute order stated that "the proposed [third amended cross-complaint] attached to the moving papers . . . continues inexplicably to assert these

63

previously dismissed claims."[20]  The proposed third amended cross-complaint attached

to DTS's motion included the eighth cause of action against Orion for interference with

contractual relations, but omitted the dismissed 10th cause of action for interference with

contractual relations against the City.  Thus, it appears that at the time he ruled on DTS's

motion for leave to amend, Judge Taylor either mistakenly believed the eighth cause of

action against Orion for interference with contractual relations had been dismissed on

demurrer, or impliedly found that the eighth cause of action lacked merit based on the

dismissal of the 10th cause of action for interference with contractual relations against

City.[21]

In any event, because the eighth cause of action against Orion for interference with

contractual relations had not been dismissed when Orion moved for summary judgment

---

[20]     The causes of action for common law misappropriation, interference with contractual relations, and unfair competition in DTS's proposed third amended cross-complaint were against Orion and DeLatte only.

[21]     Although DTS's motion for leave to file a third amended cross-complaint did not seek to add a cause of action against Orion, Orion opposed the motion by arguing that Judge Nevitt's dismissal of the contract interference cause of action against the City established that its contract interference cause of action against Orion was futile.   In reply papers and at oral argument, DTS pointed out that Orion had not challenged the eighth cause of action and it had not been dismissed.  DTS argued that its contract interference claim against Orion was based on different facts than the dismissed contract interference claim against the City, and was not superseded by its cause of action for misappropriation of trade secrets.  The court at oral argument stated, "I think Judge Nevitt did adjudicate this issue.  I think he did dismiss these counts.  And I think they are the same.  And you are asking me to second-guess a colleague, and I'm just not going to do that.  I don't have the authority to do that."  DTS's counsel responded, "Okay.  I will concede that today.  That's fine, but we still have the issue of the breach of fiduciary duty claim [against AutoReturn]."

on DTS's second amended cross-complaint, Orion's motion for summary judgment appropriately sought summary adjudication of that cause of action on the ground it was superseded by the CUTSA, and on the additional ground that DTS could not establish that Orion and DeLatte knew about DTS's contractual relations. DTS's opposition to Orion's motion did not address Orion's request for summary adjudication of the eighth cause of action, and the court granted the request on the ground DTS had not opposed it. The court granted summary adjudication of DTS's seventh cause of action for common law misappropriation and 12th cause of action for unfair competition on the same ground. The court stated in its order that by failing to oppose the portion of Orion's motion for summary judgment seeking adjudication of the eighth cause of action, "DTS has failed to preserve for appeal a challenge to the granting of the motion."[22]

The trial court's observation that DTS has forfeited the right to challenge the trial court's adjudication of its cause of action against Orion for interference with contractual relations is correct. (*Arnall v. Superior Court* (2010) 190 Cal.App.4th 360, 373 [failure to oppose summary adjudication on a particular ground before the trial court forfeits the right to challenge adjudication on that ground on appeal]; *Newton v. Clemons* (2003) 110

---

[22] It its reply brief, DTS takes the position that the court's incorrect view that its contract interference claim against Orion had been dismissed operated as a dismissal of that claim. DTS argues that it "could not defend against a motion seeking judgment on an interference claim that had been ruled dismissed already." We do not view the court's erroneous statement that a prior judge had dismissed DTS's eighth cause of action against Orion as constituting a dismissal of that cause of action. DTS could have opposed Orion's request for summary adjudication of the eighth cause of action on the merits and argued that the court misunderstood or misconstrued the effect of the prior dismissal of DTS's 10th cause of action on status of the eighth cause of action.

Cal.App.4th 1, 11 [issues raised for the first time on appeal that could have been presented to the trial court are generally deemed waived].) Because the court granted Orion's motion for summary adjudication of the eighth cause of action for intentional interference with contractual relations and DTS has forfeited the right to challenge that ruling on appeal, we will not address DTS's argument that the court erred in denying it leave to include that cause of action in a third amended cross-complaint.

Regarding its proposed cause of action for breach of fiduciary duty against AutoReturn, DTS argues on appeal that the court erred in denying leave to amend "across the board on the basis of UTSA supersession, even though AutoReturn did not assert that issue." However, the court did not rule that DTS's proposed breach of fiduciary duty cause of action was superseded by its statutory cause of action for misappropriation of trade secrets. As noted, the court denied leave to amend on the ground that "DTS's claims for *common law misappropriation, interference with contract and contractual relations, and undue business practices* were superseded by DTS's [statutory] claim for Misappropriation of Trade Secrets." (Italics added.) After DTS's counsel failed to persuade the court at oral argument that Judge Nevitt had not dismissed those causes of action against Orion and DeLatte, counsel stated, "That's fine, but we still have the issue of the breach of fiduciary duty claim [against AutoReturn]." The court responded, "You have to bring another motion [for leave to amend] and append to it a proposed . . . cross-complaint that doesn't have included in it causes of action that my colleague has already dismissed." "If you want to try and seek leave to amend again . . . with just the fiduciary

duty claim appended, just that being the new proposed third amended cross-complaint, that might be another kettle of fish."

Thus, the court did not deny DTS leave to add a cause of action against AutoReturn for breach of fiduciary duty; the court invited DTS to file another motion for leave to amend to add that cause of action with a proposed third amended cross-complaint that omitted the second amended cross-complaint's seventh, eighth, and 12th causes of action against Orion for common law misappropriation, interference with contractual relations, and unfair competition, respectively. The court deferred ruling on whether it would allow DTS to add a cause of action against AutoReturn for breach of fiduciary duty until DTS submitted a proposed third amended cross-complaint that omitted the three causes of action that the court believed had been dismissed. The court later disposed of those three causes of action by granting Orion's motion for summary adjudication of the seventh, eighth, and 12th causes of action of DTS's second amended cross-complaint.

Because the trial court declined to exercise its discretion and rule on whether to grant DTS leave to plead a cause of action for breach of fiduciary duty against AutoReturn, DTS is free on remand to file a motion for leave to amend its second amended cross-complaint to add that cause of action. If DTS files a new motion for leave to file a third amended cross-complaint, its proposed third amended cross-complaint should omit the three causes of action against Orion that court summarily adjudicated in Orion's favor.

67

I. *AutoReturn's Reliance on Declarations Filed with Its Previous Motion for Summary Judgment Against ACT*

ACT's contends the court should have denied AutoReturn's motion for summary judgment on ACT'S fourth amended complaint as procedurally defective because AutoReturn did not provide its supporting evidence with the motion. AutoReturn initially filed a motion for summary judgment on ACT's fourth amended complaint in January 2012. AutoReturn later withdrew the motion and refiled a revised version of it in March 2012. Rather than refile all of the declarations it filed in support of its original motion for summary judgment against ACT, AutoReturn stated in a footnote in its memorandum of points and authorities in support of its second motion: "Each of the declarations referred to in this Memorandum of Points and Authorities was filed with this Court on January 6, 2012, when AutoReturn originally filed a motion for summary judgment against ACT." In its summary judgment order, the court rejected ACT's argument that the declarations in question were irrelevant because they were not served with the moving papers, stating: "The declarations in question were part of a similar although not identical motion filed on 1/9/12 . . . which went off calendar. However, the declarations were served on [ACT] in connection with the earlier motion, so [ACT] is aware of and has copies of same."

We agree with the trial court's implied finding that ACT was not prejudiced by the court's consideration of the declarations that the City and AutoReturn filed with their prior motion for summary judgment, and conclude that the court acted within its

discretion in considering the declarations. ACT cites *Fleet v. CBS, Inc.* (1996) 50 Cal.App.4th 1911 (*Fleet*) for the proposition that the evidence supporting a motion for summary judgment must be provided with the motion; it is not enough to refer to other sources where the evidence may be located. In *Fleet*, the defendant moving for summary judgment stated only one fact in its separate statement of undisputed facts and, in the words of the *Fleet* court, "expected the court to glean the background facts necessary to resolving its motion from the complaint [and other sources]." (*Id.* at p. 1916, fn. 3.) The *Fleet* court noted that "[e]very motion for summary judgment should be accompanied by a 'separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed.' (Code Civ. Proc., § 437c, subd. (b).) Facts stated elsewhere need not be considered by the court [citation], and failure to comply with this rule constitutes ground for denial *at the court's discretion* [citation]." (*Fleet, supra,* 50 Cal.App.4th at p. 1916, fn. 3, italics added.) Because the trial court "was apparently willing [to glean the background facts from other sources] and because the crucial facts [were] to be found somewhere in the record and [were] undisputed by appellants, [the *Fleet* court decided it would] not disturb the trial court's ruling on this ground." (*Ibid.*)

In the present case, there is no issue regarding facts not stated in AutoReturn's separate statement; ACT's complaint is that AutoReturn's separate statement's cites declarations that were submitted with a prior summary judgment motion. *Fleet* supports the proposition that the trial court has discretion to overlook defects in the separate statement and the moving party's presentation of evidence.

ACT also cites *Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830 (*Artiglio*) for the proposition that "facts[]stated elsewhere may not be considered by the court—even if submitted with a party's earlier summary judgment motion." In *Artiglio* the plaintiffs opposing a motion for summary judgment failed to cite specific evidence that contradicted the moving defendant's evidence. The plaintiffs' separate statement of disputed facts simply stated: " 'See evidence previously produced in opposition to [defendant's] earlier motions for summary judgment.' " (*Id.* at p. 841.) Further, the plaintiffs' memorandum of points and authorities in opposition to the summary judgment motion did not "provide any greater clue about what evidence they believe contradicted the evidence presented by [the defendant]." (*Ibid.*) Based on the plaintiffs' failure to cite any evidence that contradicted the defendant's evidence, the *Artiglio* court concluded that "the trial court was fully warranted in concluding [the defendant's] evidence was not disputed." (*Id.* at p. 842.) *Artiglio* is inapposite because AutoReturn's separate statement in support of its motion for summary judgment cited specific evidence supporting each fact listed in its separate statement. The trial court was not required to deny AutoReturn's motion simply because certain declarations cited in AutoReturn's separate statement had been filed and served on ACT with AutoReturn's earlier withdrawn motion.

## II. *Summary Adjudication of ACT's Seventh Cause of Action for Unfair Business Practices*

ACT contends the trial court erred in granting summary adjudication of its cause of action against AutoReturn for unfair business practices in violation of the Business and Professions Code section 17200 et seq., commonly referred to as the unfair competition

law (UCL). Business and Professions Code section 17200 defines unfair competition as "any unlawful, unfair or fraudulent business act or practice . . . ." Because the statute " 'is written in the disjunctive, it establishes three varieties of unfair competition–acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).)

The California Supreme Court in *Cel-Tech* held that in the context of a UCL action against a direct competitor of the plaintiff, in contrast to a consumer action, the word "unfair" in Business & Professions Code section 17200 "means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech, supra,* 20 Cal.4th at p. 187, fn. omitted.) The *Cel-Tech* court emphasized that "the ' "antitrust laws . . . were enacted for 'the protection of *competition*, not *competitors*.' " ' [Citation.] . . . Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws." (*Id.* at p. 186.)

"The 'unlawful' practices prohibited by [Business and Professions Code] section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. [Citation.] It is not necessary that the predicate law provide for private civil enforcement. [Citation.] . . . [Business and Professions Code] section 17200 'borrows' violations of other laws and treats them as

71

unlawful practices independently actionable under [Business and Professions Code] section 17200 et seq." (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 838-839.)

"[U]nder the fraud prong of the UCL a plaintiff need not show that he or others were actually deceived or confused by the conduct or business practice in question. . . . A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage." (*Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1167.) The plaintiff need only "show deception to some members of the public, or harm to the public interest" (*Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.* (C.D.Cal. 2001) 178 F.Supp.2d 1099, 1121 (*Watson Laboratories*), or " 'that members of the public are likely to be deceived.' " (*Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at p. 1167.)[23]

In its seventh cause of action for unfair business practices in violation of the UCL, ACT alleged that it "sustained actual harm and injury resulting from the unlawful, unfair and fraudulent competition and business practices on the part of AutoReturn . . . ." Specifically, ACT alleged that the City awarded the towing contract to AutoReturn based

---

[23] In *In re Tobacco II Cases* (2009) 46 Cal.4th 298, the California Supreme Court held that to comply with UCL's standing requirements after 2004 amendments to the UCL by Proposition 64, a class representative in a consumer class action alleging misrepresentation under the fraudulent prong of the UCL "must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions" (*In re Tobacco II Cases,* at p. 306.) The Supreme Court further held, however, that the "standing requirements are applicable only to the class representatives, and not all absent class members." (*Ibid.*)

on "AutoReturn's wrongful inclusion of LETS and TMS software platforms in response to the 2008 RFP and in disregard of ACT's exclusive license to use . . . LETS and TMS software products in San Diego County, and in violation of the City Charter and Municipal Code."

The trial court granted summary adjudication of ACT's seventh cause of action on several grounds. First the court ruled that ACT lacked standing to bring its claim under the UCL because ACT only "leased" DTS's software. The court further ruled that even if ACT could show it had standing, it had "not shown a causal connection between the unlawful practice it alleges and the injury it claims to have suffered. It only speculates that but for AutoReturn's inclusion of LETS/TMS in its bid, [ACT] would have been awarded the contract. This conclusory, speculative statement is insufficient to raise a triable issue of material fact." The court then ruled that to the extent ACT based its UCL claim on its eighth cause of action for interference with contractual relations, "both claims fail because no contract was ever breached." The court also ruled that ACT's seventh cause of action failed under the " 'unfair' prong of the UCL because ACT did not and cannot establish AutoReturn's conduct violated an antitrust law[]"—i.e., that it injured competition and not just a particular competitor. Finally, the court ruled that as a result of ACT's having brought its 18th cause of action for misappropriation of trade

secrets, ACT's seventh cause of action was "superseded by the CUTSA as a matter of law."[24]

We conclude the court erred in summarily adjudicating ACT's seventh cause of action in AutoReturn's favor. ACT had standing to bring its UCL claim against AutoReturn regardless of whether it had standing to bring a claim for misappropriation of trade secrets based on AutoReturn's use of LETS/TMS in its bid. Business and Professions Code section 17204 confers standing to bring a UCL action on "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." ACT's UCL claim is based on its exclusive license to use LETS/TMS in San Diego County and not on the alleged trade secret status of LETS/TMS. ACT claims, and argued in opposition to AutoReturn's motion for summary judgment, that it would have been awarded the towing contract but for AutoReturn's unfair business practice of "bidding the LETS/TMS software products in disregard of ACT's exclusive use rights, to the loss of $1.5 million." Regardless of the merit of that claim, ACT has standing to assert it.

The trial court correctly ruled that ACT's seventh cause of action failed under the "unfair" prong of the UCL. There is no evidence that AutoReturn's alleged unfair practice threatened an incipient violation of an antitrust law, violated the policy or spirit

---

24    ACT voluntarily dismissed its 18th cause of action for misappropriation of trade secrets without prejudice the same day it filed its opposition to AutoReturn's motion for summary judgment. Despite the dismissal, the court granted AutoReturn's motion for summary adjudication as to the 18th cause of action.

of one of those laws, or significantly threatened or harmed competition as opposed to harming ACT as a direct competitor. (*Cel-Tech, supra,* 20 Cal.4th at pp. 186-187.) However, we conclude there was sufficient evidence to preclude summary adjudication of ACT's seventh cause of action under the "unlawful" and "fraudulent" prongs of the UCL.

As noted, the unlawful practices prohibited under Business and Professions Code section 17200 include any practices forbidden by civil law. (*Saunders v. Superior Court, supra,* 27 Cal.App.4th at pp. 838-839.) "Since the addition of the word 'unlawful' to the predecessor statute in 1963, this section has been liberally construed so as not to be limited to traditional anticompetitive practices." (*People v. E.W.A.P., Inc.* (1980) 106 Cal.App.3d 315, 318.) As we discuss *infra*, AutoReturn's use of LETS/TMS fell within the unlawful prong of the UCL because it subjected AutoReturn to liability for tortious interference with ACT's contractual relationship with DTS with ACT's prospective economic advantage.

Regarding the fraudulent prong of the UCL, we reiterate that the plaintiff need only "show deception to some members of the public, or harm to the public interest" (*Watson Laboratories, supra,* 178 F.Supp.2d at p. 1121) or " 'that members of the public are likely to be deceived.' " (*Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at p. 1167.) ACT's UCL cause of action is viable under the fraudulent prong because it is based on AutoReturn's alleged fraudulent representations to the City that it was authorized to use LETS/TMS in its prospective performance of the City's towing contract and, therefore, implicates public deception or harm to the public interest. (*Watson Laboratories, supra,*

75

178 F.Supp.2d at p. 1121; *Travelers Prop. Cas. Co. of Am. v. Centex Homes* (N.D.Cal. Aug. 26, 2013, No. 12–0371–SC) 2013 U.S.Dist. Lexis 121401 [corporation may bring a UCL fraud prong claim if it shows the alleged wrongdoing has some impact on the general public].)[25] Deceptive public contract bidding is inherently harmful to the public interest and deceives the general public through public employees who issue requests for public contract bids and award public contracts on behalf of the general public. Accordingly, we conclude that a deceptive bid that harms a direct competitor as well as the public interest may serve as the basis for an action by the direct competitor under the

---

[25]    AutoReturn contends that ACT waived the right to argue on appeal that its seventh cause of action falls under the fraudulent prong of the UCL because ACT did not make that argument in opposition to AutoReturn's motion for summary judgment  We disagree. In its seventh cause of action, ACT alleged that AutoReturn engaged in fraudulent business practices, and specifically alleged that AutoReturn "falsely represented to the City that AutoReturn was authorized to utilize LETS and TMS systems in AutoReturn's prospective performance of the [towing contract] in the event said contract was awarded to AutoReturn."  The seventh cause of action further alleges that AutoReturn falsely represented to the City that "ACT has no rights of exclusivity which would bar an award of the [contract] to AutoReturn."  In its opposition to AutoReturn's summary judgment motion, ACT argued that the City awarded the contract to AutoReturn "based upon AutoReturn's false representation that it would use the LETS and TMS products to automate tow dispatching for the City.  Having **used** LETS/TMS to bait the City, once AutoReturn was awarded the . . . contract, it then switched to other allegedly non-infringing computer software to avoid ACT's preliminary injunction of its infringement of ACT's exclusive license rights in LETS/TMS."  In arguing that it had standing to bring a UCL claim because it lost money as a result of AutoReturn's infringement of its exclusive license, ACT contended that AutoReturn's interference with ACT's rights in LETS/TMS arose when AutoReturn "falsely represented" to the City that AutoReturn was able and intended to use LETS/TMS in the performance of the contract.  This argument in ACT's opposition to AutoReturn's motion for summary judgment, along with the allegations in ACT's seventh cause of action, sufficiently preserve ACT's right to argue on appeal that its seventh cause of action is viable under the fraudulent prong of the UCL.

"fraudulent" prong of Business and Professions Code section 17200. In the present case, ACT presented evidence that AutoReturn's allegedly deceptive bid harmed the public interest by resulting in a substantial delay in AutoReturn's ability to perform the towing contract while it developed software to replace LETS/TMS after ACT complained that AutoReturn's proposal infringed ACT's exclusive license to use LETS/TMS in San Diego County.

ACT contends the trial court erred in ruling there was no evidence showing a causal connection between AutoReturn's alleged unlawful business practice and the resulting injury ACT claims to have suffered. We conclude the evidence is sufficient to raise a triable issue of fact as to causation. The court made a factual finding based on declarations of three City employees, which the court referred to as "undisputed testimony," that the "City did not require any specific software platform, and that it ranked AutoReturn's proposal highest because of its superior technical score and its oral and written responses." However, ACT presented sufficient evidence to raise a triable issue of fact as to whether AutoReturn's use of the LETS/TMS software in its bid proposal was a substantial factor in the City's decision to award the towing contract to AutoReturn. AutoReturn's bid proposal was almost entirely based on its proposed use of LETS/TMS. ACT submitted evidence that AutoReturn represented to the City during the bidding process that AutoReturn's ARIES platform was then comprised of LETS and TMS, that AutoReturn would use LETS/TMS to manage tows under the contract, and that LETS/TMS was already in place and being used by the SDPD. The fact that AutoReturn's proposed use LETS/TMS software was essentially the centerpiece of its

77

proposal raises a reasonable inference that the software was a substantial factor in the City's decision to award AutoReturn the towing contract. The fact that the City ranked ACT's proposal second to AutoReturn's supports a reasonable inference that the City likely would have awarded ACT the contract if AutoReturn had not included LETS/TMS in its proposal.

Further, a "Consensus Technical Evaluation Form—Summary" prepared by the City's Technical Evaluation Committee (the committee) noted AutoReturn's use of a "Dispatch Tow System" as a component of AIRIES and gave AutoReturn's proposal an "Exceptional" rating because "AutoReturn offers a fully comprehensive, all inclusive suite of services that will allow the City of San Diego to migrate their current system seamlessly with little or no impact to the current business operation." The committee's evaluation further stated that AutoReturn's proven experience and expertise "combined with the system capabilities provided by the DTS . . . software platform will fulfill all the requirements to provide the communication and administrative services the City of San Diego requires." The evaluation concluded with the statement that "[t]he integration of LETS/TMS, DTS and the ARIES full-feature solutions will meet and exceed the City Dispatch Towing Services RFP requirements." Another bidder whose proposal was rated acceptable but not exceptional proposed to use software other than LETS and integrate it with TMS. The committee rated this proposal as marginal, stating: "If the TMS system is not available from the other vendor it would require this vendor to develop and integrate a new system to replace its functions. *This may cause of action a delay in implementation and/or unknown additional costs to the City.*" (Italics added.) It is

reasonable to infer from this statement that the City may not have awarded the contract to AutoReturn if AutoReturn's proposal indicated it would have to develop a new software platform to replace LETS/TMS's functions in its ARIES software. The committee's evaluations raise a triable issue of fact as to whether AutoReturn's use of LETS/TMS in its proposal was a substantial factor in the City's decision to award the contract to AutoReturn.

III. *Summary Adjudication of ACT's 18th Cause of Action for Misappropriation of Trade Secrets and Ruling That It Supersedes the Seventh Cause of Action*

As noted, the court granted AutoReturn's motion for summary adjudication as to ACT's 18th cause of action for misappropriation of trade secrets even though ACT voluntarily dismissed that cause of action without prejudice the same day it filed its opposition to AutoReturn's motion for summary judgment. In the same order, the court ruled that ACT's seventh cause of action for unfair business practices in violation of the UCL was "superseded by the CUTSA as a matter of law." On appeal, ACT challenges the court's jurisdiction to summarily adjudicate the 18th cause of action and rule that it supersedes the seventh cause of action.

We conclude that the court lacked jurisdiction to summarily adjudicate ACT's 18th cause of action after ACT voluntarily dismissed it. Code of Civil Procedure section 581, subdivision (c) provides that "[a] plaintiff may dismiss his or her complaint, or any cause of action asserted in it, in its entirety, or as to any defendant or defendants, with or without prejudice prior to the actual commencement of trial." In ruling that it could properly adjudicate ACT's 18th cause of action despite ACT's having voluntarily

79

dismissed it, the trial court cited *Cravens v. State Bd. of Equalization* (1997) 52 Cal.App.4th 253, 257 (*Cravens*), in which the Court of Appeal decided the trial court had properly ruled on a motion for summary judgment where the plaintiff had not filed opposition to the motion and voluntarily dismissed the action the day before the hearing on the motion. The *Cravens* court stated: "[R]espondents' moving papers met their burden of negating appellant's claims, entitling them to judgment as a matter of law if no issues of disputed fact were raised. Appellant failed to file opposition within the requisite time. At that point, entry of summary judgment in favor of respondents became a formality which appellant could not avoid by the stratagem of filing a last minute request for dismissal without prejudice." (*Ibid*.)

Cravens is distinguishable from the present case, which is more analogous to *Zapanta v. Universal Care, Inc.* (2003) 107 Cal.App.4th 1167 (*Zapanta*). The plaintiffs in *Zapanta* filed a request to dismiss their medical malpractice lawsuit without prejudice one day before their opposition to the defendants' motion for summary judgment was due. (*Id.* at p. 1169.) The trial court struck the plaintiffs' request for dismissal and granted defendants' summary judgment motion on the merits. (*Id.* at pp. 1170-1171.) The *Zapanta* court reversed the judgment, concluding that the plaintiffs' request for dismissal was valid and that the trial court exceeded its jurisdiction in granting the defendant's motion for summary judgment. (*Id.* at pp. 1171, 1174.)

The *Zapanta* court distinguished *Cravens*, noting that the plaintiff in *Cravens* filed a request for dismissal one day before the summary judgment hearing and that the defendants had no notice of the dismissal and appeared at the hearing. (*Zapanta, supra,*

80

107 Cal.App.4th at p. 1172.) The *Zapanta* court stated: "By contrast, appellants here did not fail to file opposition to the summary judgment motion; *they filed their request for dismissal prior to their deadline for filing opposition to the summary judgment motion*, albeit by only one day. Under these circumstances, it cannot be said that judgment on the motion was a mere formality, thus distinguishing this case from *Cravens*." (*Id.* at pp. 1172-1173, some italics added.) The *Zapanta* court concluded: "At the time appellants filed their request for dismissal, the opposition to the summary judgment motion was not past due, no hearing on the motion had been held and no tentative ruling or other decision tantamount to an adjudication had been made in respondents' favor. In other words, the case had not yet reached a stage where a final disposition was a mere formality." (*Id.* at pp. 1173-1174.)

Similar to the situation in *Zapanta*, when ACT filed its request to dismiss its 18th cause of action there had been no hearing on AutoReturn's motion for summary adjudication of the cause of action, there was no tentative decision in AutoReturn's favor on the motion, and it cannot be said a final disposition of the cause of action was a mere formality. Accordingly, the court lacked jurisdiction to summarily adjudicate the 18th cause of action.[26]

---

26    The court also cited *Mary Morgan, Inc. v. Melzark* (1996) 49 Cal.App.4th 765, in which the Court of Appeal decided the plaintiff could not voluntarily dismiss the action without prejudice after the court announced an adverse tentative summary judgment ruling and the summary judgment hearing had commenced and been continued to permit the plaintiff to produce additional opposition evidence (*id.* at pp. 768-769), and *Harbrodt v. Burke* (1996) 42 Cal.App.4th 168, in which the Court of Appeal held that a plaintiff could not avoid dismissal of an action as a discovery sanction by voluntarily dismissing

We conclude that ACT's voluntary dismissal of the 18th cause of action also deprived the court of jurisdiction to rule, post-dismissal, that ACT's seventh cause of action was superseded under the CUTSA by the dismissed 18th cause of action. "A plaintiff's voluntary dismissal of his action has the effect of an absolute withdrawal of his claim and leaves the defendant as though he had never been a party. . . . '[I]t is a well-settled proposition of law that where the plaintiff has filed a voluntary dismissal of an action . . . , the court is without jurisdiction to act further [citations], and any subsequent orders of the court are simply void.' " (*Paniagua v. Orange County Fire Authority* (2007) 149 Cal.App.4th 83, 89; *Harris v. Billings* (1993) 16 Cal.App.4th 1396, 1405 [after a voluntary dismissal of an action under Code of Civil Procedure section 581 the trial court lacks jurisdiction to act further in the action except to award costs and statutory attorney fees].) Accordingly, at the time it ruled on AutoReturn's motion for summary judgment, the court lacked jurisdiction to rule that the dismissed 18th cause of action superseded the seventh cause of action.

Further, we conclude that if ACT had not voluntarily dismissed its 18th cause of action, it would not supersede its seventh cause of action. "CUTSA provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other [claims and] civil remedies 'based upon misappropriation of a trade secret.' (§ 3426.7,

the action without prejudice because that "tactic would simply defeat the trial court's power to enforce its discovery orders." (*Id.* at pp. 175-176.) These cases are distinguishable. ACT voluntarily dismissed its 18th cause of action before the trial court issued a tentative ruling on AutoReturn motion for summary judgment and the dismissal did not implicate the court's power to enforce discovery orders through a terminating sanction.

82

subds. (a), (b).)"  (*Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 236, 238 (*Silvaco*).)  The determination of whether a claim is based on misappropriation of a trade secret is largely factual.  (*Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 505.)  The "UTSA by its terms does not displace a contract claim, even if it is based on the misappropriation of a trade secret.  (Civ. Code, § 3426.7, subd. (b)(1).)  Moreover, UTSA does not displace noncontract claims that, *although related to a trade secret misappropriation, are independent and based on facts distinct from the facts that support the misappropriation claim*."  (*Angelica,* at p. 506, italics added.)

ACT's seventh cause of action cause of action on its face is based on facts that are distinct from the alleged facts that support ACT's 18th cause of action for misappropriation of trade secrets.  The seventh cause of action was included in ACT's original complaint filed in 2009 after the City awarded AutoReturn the towing contract but before AutoReturn decided not to use LETS/TMS and develop its own software to replace it.   The factual basis of the seventh cause of action is AutoReturn's alleged infringement of ACT's exclusive license to use LETS/TMS in San Diego County—i.e., the City's award of the towing contract to AutoReturn "based upon AutoReturn's wrongful inclusion of LETS and TMS software platforms in response to the 2008 RFP and in disregard of ACT's exclusive license to use . . . LETS and TMS software products in San Diego County . . . ."  The seventh cause of action contains no reference to a trade secret and is in no way dependent on whether any aspect of LETS/TMS is a trade secret. Thus, it is not a claim " 'based upon misappropriation of a trade secret.' "  (*Silvaco, supra,* 184 Cal.App.4th at p. 238.)

In contrast, ACT's 18th cause of action for misappropriation of trade secrets is based on allegations that ACT maintained the LETS/TMS programs "as confidential, proprietary, and exclusively licensed trade secrets . . . under passworded lock and key," and that AutoReturn acquired ACT's "confidential, proprietary and trade secret information and trade secrets through improper means[,]" and used and allowed "non-licensed third parties" to use that information to unfairly compete with ACT in violation of its exclusive license.   In short, the seventh cause of action is based on alleged infringement of an exclusive license to use software; the 18th cause of action is based on alleged misappropriation of trade secrets contained within the software.  Although ACT's seventh cause of action is related to the 18th cause of action, each cause of action is based on distinct facts.  Thus, the 18th cause of action does not preempt or supersede the seventh cause of action.  The court erred in summarily adjudicating ACT's seventh cause of action in AutoReturn's favor.

IV. *Summary Adjudication of ACT's Eighth Cause of Action for Intentional Interference with Contractual Relations*

ACT contends the trial court erred in summarily adjudicating ACT'S eighth cause of action of intentional interference with contractual relations.  The elements of "a cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citations.]'  [Citation.]  The plaintiff need not allege an actual breach,

84

but only interference with or disruption of his or her contractual relations." (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 343-344.) " '[I]t is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself. [Citation.] [¶] . . . Intentionally inducing or causing a breach of an existing contract is . . . a wrong in and of itself. . . .' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1158 (*Korea Supply*).)

The contract that is the subject of this cause of action against AutoReturn is the Ball contract as amended in 2003–the agreement between DTS and ACT that gave ACT an exclusive license to use DTS's LETS/TMS software in San Diego County. In its eighth cause of action, ACT alleged that AutoReturn interfered with ACT's contractual relations with DTS by entering into negotiations and contractual relationships with DTS for the use of LETS/TMS, using confidential, proprietary and trade secret information regarding LETS/TMS in its bid for the towing contract, and falsely representing to the City that ACT's exclusive rights in LETS/TMS had expired or terminated.

In its motion for summary judgment AutoReturn did not separately address the eighth cause of action; it argued generally that it was entitled to summary adjudication of ACT's seventh through 13th, 18th, and 21st causes of action because it never used DTS's software in San Diego and ACT could not establish a causal connection between AutoReturn alleged use of DTS's software and ACT's loss of the towing contract. The trial court ruled: "AutoReturn is entitled to summary adjudication of ACT'S counts #7-14, 18, and 21 because AutoReturn did not interfere with ACT's alleged exclusive license given that AutoReturn never used LETS/TMS. Further, AutoReturn is entitled to

summary judgment/adjudication of these same claims because the undisputed facts show that AutoReturn's mentioning of LETS/TMS in its proposal did not cause ACT any harm."

In considering whether AutoReturn could be held liable for inducing a breach of this contract or disrupting the contractual relationship between DTS and ACT, it is important to focus on the contract's relevant terms.  The subject agreement (2003 amendment) provided that in the event ACT's contract with the City was extended past its expiration date of December 31, 2004, DTS was "strictly prohibited from *entering into any communications or negotiations with the City . . . **or any other person** relating to operational or dispatching/communications without first obtaining prior written consent from* [*ACT's*] *president or other authorized representative*."  (Italics & boldface added.)  The 2003 amendment provided that DTS granted ACT "and its members an irrevocable license for the exclusive use in San Diego County, California, of the TMS software, including, but not limited to, any related software and/or updates or revisions thereto."  The 2003 amendment also provided that "*DTS shall refrain from offering any similar or competing service to any person operating a tow company or engaged in tow and/or related services within* [*San Diego County*], including, but not limited to . . . the City, and/or any third party tow company."  (Italics added.)

The emphasized language shows that, contrary to the trial court and AutoReturn's reasoning, ACT did not have to present evidence that AutoReturn used DTS's software in San Diego County for DTS to be held liable for breaching its contract with ACT.  Regardless of whether AutoReturn "used" LETS/TMS, the evidence shows that DTS

86

committed acts in connection with AutoReturn's bid for the City towing contract that breached the terms of its contract with ACT. DTS cooperated with AutoReturn in AutoReturn's bid preparation without obtaining prior written consent from ACT as the contract required. As noted *ante*, AutoReturn wanted to use LETS/TMS in its bid proposal to avoid incurring additional expenses and having to retrain its employees on different software. DTS's management agreed to work with AutoReturn on its bid proposal despite knowing and communicating to AutoReturn that ACT would take issue with DTS's licensing LETS/TMS to AutoReturn for use in San Diego. DTS's CEO Estes later informed AutoReturn that ACT claimed an exclusive license to use LETS/TMS in San Diego but Estes and DTS's management assured AutoReturn that the exclusive license was invalid and unenforceable. Given that assurance, AutoReturn submitted a bid proposal to the City that was based on its proposed use of LETS/TMS. The relationship between DTS and AutoReturn soured only after AutoReturn decided not to not use LETS/TMS in performing the city contract because of ACT's exclusive license claim.

Thus, there is sufficient evidence to support a claim that AutoReturn induced DTS to breach the provision in its agreement with ACT that "strictly prohibited" it "from entering into any communications or negotiations with . . . any . . . person relating to operational or dispatching/communications without first obtaining prior written consent from [ACT's] president or other authorized representative." The evidence regarding DTS and AutoReturn's working together on AutoReturn's bid for the towing contract also violates the spirit, if not the letter, of the contract provision prohibiting DTS "from offering any similar or competing service to any person operating a tow company or

87

engaged in tow and/or related services within [San Diego County], including, but not limited to . . . the City, and/or any third party tow company."[27]

A trier of fact could reasonably find that AutoReturn induced DTS to breach or disrupt its exclusive license agreement with ACT by cooperating and working closely with AutoReturn on AutoReturn's bid to the City, which was based on AutoReturn's proposed use of DTS's LETS/TMS. DTS's communication and cooperation with AutoReturn regarding AutoReturn's use of LETS/TMS in its bid evidences both DTS's breach of its contract with ACT and AutoReturn's inducement of the breach and disruption of DTS and ACT's contractual relationship. Regarding causation and damages, as we discussed in connection with ACT's seventh cause of action for unfair business practices, there is sufficient evidence to raise a triable issue of fact as to whether AutoReturn's use of LETS/TMS in its bid was a substantial factor in the City's decision to award AutoReturn the towing contract, and whether ACT would have won the contract if AutoReturn had not used LETS/TMS in its bid. The court erred in granting AutoReturn's motion for summary adjudication of the eighth cause of action.

---

27    The only reason it may not violate the letter of that provision is that AutoReturn was not yet engaged in towing related services in San Diego County when DTS helped it with its bid. In any event, regardless of whether DTS actually breached that provision, a trier of fact could reasonably view AutoReturn's working with DTS to prepare a bid based on its proposed use LETS/TMS as a disruption of DTS's contractual relationship with ACT.

V. *Summary Adjudication of ACT's Eighth Cause of Action for Intentional Interference with Prospective Economic Advantage*

The elements of the tort of intentional interference with prospective economic advantage "are usually stated as follows:  ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." ' "  (*Korea Supply, supra,* 29 Cal.4th at p. 1153.)  "[A] plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself. ' "  (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392-393.)  Although intentional interference with prospective economic advantage and intentional interference with contract are distinct torts, a plaintiff may be able to state causes of action for both torts.  (*Korea Supply, supra,* 29 Cal.4th at p. 1157.)

ACT alleged in its ninth cause of action that AutoReturn intentionally interfered with ACT's "actual and prospective economic relationships with the City" by engaging in the same conduct alleged in its eighth cause of action for intentional interference contractual relations—i.e., by entering into negotiations and contractual relationships with DTS for the use of LETS/TMS, using confidential, proprietary and trade secret information regarding LETS/TMS in its bid for the towing contract, and falsely

representing to the City that ACT's exclusive rights in LETS/TMS had expired or terminated. As noted, AutoReturn sought summary adjudication of both the eighth and ninth causes of action on the grounds it never used DTS's software in San Diego and ACT could not establish a causal connection between AutoReturn alleged use of DTS's software and ACT's loss of the towing contract.

The trial court in its order granting AutoReturn's motion for summary judgment on ACT's fourth amended complaint did not separately address ACT's ninth cause of action for intentional interference with prospective economic advantage. As noted *ante*, the order states that "AutoReturn is entitled to summary adjudication on ACT'S counts #7-14, 18, and 21 because AutoReturn did not interfere with ACT's alleged exclusive license given that AutoReturn never used LETS/TMS. Further, AutoReturn is entitled to summary judgment/adjudication of these same claims because the undisputed facts show that AutoReturn's mentioning of LETS/TMS in its proposal did not cause ACT any harm."[28]

The evidence that AutoReturn intentionally interfered with ACT's exclusive license to use LETS/TMS in San Diego County by using LETS/TMS in its proposal for the City's towing contract and that, as a result, ACT lost the future economic benefit it would have realized by continuing its contractual relationship with the City is sufficient

---

[28] Through inadvertence or clerical error, the summary judgment order referred to ACT's 10th cause of action for "Imposition of Constructive Trust" and 11th cause of action for "Equitable Lien" as ACT's eighth and ninth causes of action, respectively, stating: "ACT's counts 8 and 9 alleging a constructive trust or equitable lien fail as a matter of law as each is a remedy and not a cause[] of action."

90

to defeat AutoReturn's motion for summary adjudication of ACT's ninth cause of action for intentional interference with prospective economic advantage. For purposes of summary adjudication, ACT satisfied the requirement of showing independently wrongful conduct by presenting sufficient evidence to raise a triable issue of fact as to whether AutoReturn falsely represented to the City that it had legal access to and the right to use LETS/TMS in its prospective performance of the City's towing contract, and whether AutoReturn induced DTS to breach its exclusive license contract with ACT by working with AutoReturn to include LETS/TMS in AutoReturn's bid proposal. We reiterate that the evidence raises a triable issue of fact as to whether AutoReturn's use of LETS/TMS in its bid was a substantial factor in the City's decision to award AutoReturn the towing contract, and whether ACT would have won the contract if AutoReturn had not used LETS/TMS in its bid. Accordingly, the court erred in granting AutoReturn's motion for summary adjudication of ACT's ninth cause of action.

*AUTORETURN AND THE CITY'S APPEAL*

I. *Trial Court's Jurisdiction to Consider AutoReturn's Request for Attorney Fees Against ACT Under Section 3426.4*

AutoReturn's contention that the court erred in ruling it lacked jurisdiction to consider AutoReturn's request for attorney fees under section 3426.4 against ACT has merit.[29] The court found that "ACT's and DTS's decision to drag City and AutoReturn

_____

[29] Although AutoReturn's notice of motion for attorney fees identifies the moving parties as both AutoReturn and the City, their argument heading regarding fees under section 3426.4 states that ACT and DTS "must compensate AutoReturn for attorney fees spent in response to trade secret claims brought in bad faith under . . . [section] 3426.4."

91

into the case was made without any admissible evidence (as opposed to rumor, suspicion, and speculation) of any wrongdoing by City and AutoReturn, and was thus objectively unreasonable and in bad faith." However, the court denied AutoReturn's motion for attorney fees under section 3426.4 as to ACT on the ground it lacked jurisdiction to award fees because ACT had dismissed its trade secret cause of action.

As noted, after a voluntary dismissal of an action under Code of Civil Procedure section 581 the trial court lacks jurisdiction to act further in the action *except to award costs and statutory attorney fees*. (*Harris v. Billings, supra,* 16 Cal.App.4th at p. 1405.) Section 3426.4 provides, in relevant part: "If a claim of misappropriation is made in bad faith . . . the court may award reasonable attorney's fees and costs to the prevailing party."

It is clear under case law that a defendant to a claim for misappropriation of trade secrets may be deemed a prevailing party under section 3426.4 when the plaintiff voluntarily dismisses the claim. In *SASCO v. Rosendin Electric, Inc.* (2012) 207 Cal.App.4th 837, a former employer sued form employees and a competitor for misappropriation of trade secrets and other causes of action. (*Id.* at pp. 840-841.) After the defendants filed a motion for summary judgment the plaintiff dismissed its action, including a cause of action for misappropriation of trade secrets, without having filed opposition to the summary judgment motion. (*Id.* at p. 842.) Defendants then successfully moved for attorney fees and costs under section 3426.4. (*Id.* at pp. 842-

_____

(Capitalization omitted.) AutoReturn and the City's briefs in this appeal argue only that the court erred in not awarding attorney fees under section 3426.4 to AutoReturn against ACT. We view this challenge to the court's denial of fees against ACT to be limited to the denial as to AutoReturn only, and not as to the City.

843.)  On appeal the plaintiff challenged the trial court's ruling that its trade secret claim was objectively specious, but did not challenge the court's finding that the defendants were prevailing parties under section 3426.4.  (*Id.* at p. 845.)  The Court of Appeal affirmed the award of fees and costs.  (*Id.* at p. 849.)

In *Cypress*, the plaintiff voluntarily dismissed its action for misappropriation of trade secrets and the Court of Appeal upheld the trial court's finding that the defendants were prevailing parties under section 3426.4.  (*Cypress, supra,* 236 Cal.App.4th at p. 253.)  The Court of Appeal observed that "[a] statute predicating an entitlement to fees solely or predominantly on status as the prevailing party will inevitably raise the question of why a party achieving only an arguable or equivocal victory should be permitted to recoup fees from an opponent.  The analogous question here is why a party who has made a trade secret claim in bad faith should be permitted to inflict the costs of defense on his or her opponent.  Given the manifest legislative intention to avoid such impositions, [section 3426.4] would seem to warrant a liberal construction of 'prevailing party,' trusting in the 'bad faith' requirement to filter out doubtful cases."  (*Id.* at p. 254.)

Thus, ACT's voluntary dismissal of its cause of action for misappropriation of trade secrets did not deprive the court of jurisdiction to award AutoReturn attorney fees under section 3426.4 against ACT.  We will remand the matter to the trial court to reconsider AutoReturn's motion for attorney fees and costs against ACT under section 3426.4.

II. *Denial of AutoReturn's Request for an Award of Expert Witness Fees Against DTS*

AutoReturn contends that under section 3426.4, the court erred in denying it $36,500 in costs it paid for the services of Dr. Howard Cohen, a software engineering expert that AutoReturn retained.[30]  As noted, section 3426.4 provides that recoverable costs under that statute "shall include a reasonable sum to cover the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party."  AutoReturn contends that under this language, an award of the fees it paid Cohen was mandatory.

AutoReturn did not request recovery of Cohen's fees in its motion for attorney fees and costs under section 3426.4; it listed Cohen's fees as a cost under "Other" on its memorandum of costs.  DTS challenged AutoReturn request for Cohen's fees in a motion to tax AutoReturn's costs.  DTS argued that the $55,246.66 in total costs that AutoReturn requested in its memorandum of costs, including $36,050.00 for Cohen's services, should be reduced to $10,182.42.  Regarding Cohen's fees, DTS argued:  "There does not appear to be a reasonable basis for Defendants to have spent $36,000 on a computer expert in this case.  However, without a breakdown of the time the expert purportedly spent on the case, it is impossible for DTS to provide further comment."

---

[30]  In the trial court, AutoReturn sought expert fees for Cohen's services in the amount of $36,050.

In its opposition to DTS's motion to tax costs, AutoReturn represented that Cohen "spent over 100 hours on this case reviewing pleadings and other case materials, reading hundreds of pages of documents produced by DTS, learning the ins-and-outs of both AutoReturn's and DTS's software platforms, conducting a five-day extensive review of DTS's software in August 2012, and preparing an expert report for trial." The court granted DTS's request to reduce AutoReturn's costs and awarded AutoReturn costs of $10,182.42. The court did not explain the reduction other than stating that it found DTS's "attack justified to the extent reflected [in DTS's memorandum of points and authorities in support of its motion to tax costs]."

"If the items appearing in a cost bill appear to be proper charges, the burden is on the party seeking to tax costs to show that were not reasonable or necessary. On the other hand, if the items are properly objected to, they are put in issue and the burden of proof is on the party claiming them as costs. [Citations.] Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774.)

"[T]he mere filing of a motion to tax costs may be a 'proper objection' to an item, the necessity of which appears doubtful, or which does not appear to be proper on its face. [Citation.] However, '[i]f the items appear to be proper charges the verified memorandum is prima facie evidence that the costs, expenses and services therein listed were necessarily incurred by the defendant [citations], and the burden of showing that an

95

item is not properly chargeable or is unreasonable is upon the [objecting party].' " (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 131.)

We conclude the court did not abuse its discretion in denying AutoReturn Cohen's expert fees as costs. DTS's objection to Cohen's fees designated as "other" costs was proper because the necessity of that item was doubtful—i.e., the necessity was unclear on the face of the cost memorandum. Thus, the burden of proving the cost was proper or reasonably necessary fell on AutoReturn.

The trial court could reasonably find that AutoReturn failed to meet its burden of proving Cohen's services were reasonably necessary in the preparation for trial under section 3426.4. Cohen's declarations filed in opposition to DTS's motion to tax costs and support of AutoReturn's motion for summary judgment against DTS indicate Cohen was retained as a consultant. He was not deposed as an expert designated to testify at trial. Cohen's declaration showed he performed the vast majority of his work on the case after AutoReturn and the City filed their motion for summary judgment in June 2012 and while the hearing on that motion was pending. The court could reasonably find that it was not reasonably necessary for AutoReturn to incur substantial expert fees before any expert depositions had been set and while its summary judgment motion was pending, especially considering Orion's prior success in moving for summary adjudication of DTS's trade secret claim. DTS points out that AutoReturn cited one paragraph of Cohen's declaration in its separate statement of material facts, and the court did not rely on Cohen's declaration in granting AutoReturn and the City's motion for summary judgment. The court's conclusion that Cohen's services were not reasonably necessary for trial

preparation under section 3426.4 did not exceed the bounds of reason under " 'all of the circumstances before it being considered.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

*ORION'S APPEAL*

I. *Denial of Attorney Fees Incurred by Orion's Texas Counsel*

Orion contends the court erred in denying attorney fees incurred by its Texas counsel as part of the fee award to Orion under section 3426.4. In its motion for attorney fees under section 3426.4, the total amount Orion requested ($138,631.49) included "the fees and costs charged to Orion by its longtime lawyers in Dallas ($45,536.82)." As summarized by Orion, Texas counsel's "activities included participating in strategy discussions, providing information and documents to California counsel, and reviewing pleadings and submissions to the California court that were prepared by California counsel." In its opposition to Orion's motion, DTS argued the fees sought by Orion's Texas counsel were not compensable because Texas counsel was not licensed to practice law in California and Orion "utterly failed to explain how their efforts were necessary and not duplicative of the work that was also performed by the attorneys of record in San Diego."

The trial court ruled as follows on Orion's request to recover fees paid to its Texas counsel: "The court declines to award the fees of Texas counsel, as to do so [would] send a message that it is acceptable for lawyers in other states to practice law in California without *pro hac vice* admission and make fee applications after having done so." The

97

court added that *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119 (*Birbrower*) "suggests this is the safest path."

Business and Professions Code section 6125 provides: "No person shall practice law in California unless the person is an active member of the State Bar." Accordingly, the general rule is that no one may recover compensation for attorney services in California unless the person was a member of the State Bar when the services were performed. (*Birbrower, supra,* 17 Cal.4th at p. 136; *Golba v. Dick's Sporting Goods, Inc.* (2015) 238 Cal.App.4th 1251, 1261.)

In *Birbrower,* attorneys at a New York firm that had no California-licensed attorneys traveled to California on multiple occasions to resolve a contract dispute between their California client and a computer software company. (*Birbrower, supra,* 17 Cal.App.4th at pp. 124-125.) The New York firm filed an arbitration demand against the software company in San Francisco, but the parties settled their dispute before hearings commenced. (*Id.* at p. 125.) The firm's California client later sued the firm for malpractice, and the firm filed a cross-complaint to recover fees under a fee agreement. (*Id.* at p. 126.) The trial court dismissed the firm's claim for fees, ruling that the firm was not authorized to practice law in California. (*Ibid.*) The Court of Appeal agreed and denied the petition for writ of mandate and affirmed the trial court's order. (*Id.* at p. 127.)

The Supreme Court in *Birbrower* concluded that the New York attorneys had engaged in unauthorized practice of law in California and could not recover fees for legal services performed in California for the California client. (*Birbrower, supra,* 17 Cal.4th at p. 135.) However, the *Birbrower* concluded that New York counsel *may* be able to

98

recover fees under a fee agreement with a California client for legal services it performed in New York "*to the extent they did not constitute practicing law in California . . . .*" (*Birbrower, supra,* 17 Cal.4th at p. 137, italics added.)  The corollary to that conclusion is that out-of-state counsel may *not* recover fees for legal services performed for a client if those services constitute practicing law in California, regardless of where the services were performed.

The *Birbrower* court noted that case law defines the statutory term "practice law" as " ' "the doing and performing services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure." ' "  (*Birbrower, supra,* 17 Cal.4th at p. 128.)  The practice of law also includes "legal advice and legal instrument and contract preparation, whether or not these subjects were rendered in the course of litigation."  (*Ibid.*)  Although Business and Professions Code section 6125 does not define what it means to practice law "in California," the *Birbrower* court stated that "the practice of law 'in California' entails sufficient contact with a California client to render the nature of the legal service a clear legal representation. . . .  The primary inquiry is whether the unlicensed lawyer engaged in sufficient activities in the state, or created a continuing relationship with the California client that included legal duties and obligations." (*Birbrower*, at p. 128.)

The *Birbrower* court explained that its definition of the practice of law "in California" "does not necessarily depend on or require the unlicensed lawyer's physical presence in the state.  Physical presence [in California] is one factor [courts] may consider in deciding whether the unlicensed lawyer has violated [Business and

Professions Code] section 6125, but it is by no means exclusive. For example, one may practice law in the state in violation of [Business and Professions Code] section 6125 although not physically present here by advising a California client on California law in connection with a California legal dispute by telephone, fax, computer, or other modern technological means." (*Birbrower, supra,* 17 Cal.4th at pp. 128-129.) However, the *Birbrower* court rejected "the notion that a person *automatically* practices law 'in California' whenever that person practices California law anywhere or 'virtually' enters the state by telephone, fax, e-mail, or satellite." (*Ibid.*) The Supreme Court concluded that courts "must decide each case on its individual facts." (*Ibid.*)

We conclude that the trial court properly denied Orion recovery of the fees its Texas counsel incurred because the services that Texas counsel performed constitute the practice of law in California. The services for which Orion seeks compensation unquestionably constitute a "clear legal representation" arising from a continuing relationship that included legal duties and obligations. (*Birbrower, supra,* 17 Cal.4th at p. 128.) The question is whether with respect to this case, Orion is properly viewed as a "California client" despite the fact it is a Texas corporation. We recognize that for purposes of determining whether the provision of legal services constitutes practicing law in California, the Court of Appeal in *Estate of Condon* (1998) 65 Cal.App.4th 1138 defined "California client" as a client "that either resides in or has its principle place of business in California." (*Id.* at p. 1145.) We believe, however, that it may be appropriate to view an out-of-state entity involved in litigation in California arising from the entity's activities in California as a California client with respect to legal services provided to the

100

entity in connection with the California litigation. The purpose of Business and Professions Code section 6125 is to protect California citizens from incompetent attorneys who are not trained, examined, and licensed to provide representation and legal advice in California. (*Birbrower, supra,* 17 Cal.4th at p. 132; *Condon, supra,* 65 Cal.App.4th at p. 1146.) We see no reason why an out-of-state person or entity with sufficient contacts with California to be sued in California is any less deserving of the protection from unauthorized practice of law in California than a California citizen.

Although Orion is a Texas corporation, for purposes of Business and Professions Code section 6125 and with respect to the instant litigation, we view Orion as a California client because it was sued in California under California law for alleged wrongdoing arising from business activities it conducted in California. Accordingly, Orion's Texas counsel's services in connection with this case constituted the practice of law in California because they entailed sufficient contact with a California client to render the nature of the legal service a clear legal representation, and Texas counsel undisputedly had a continuing relationship with Orion that included legal duties and obligations. (*Birbrower, supra,* 17 Cal.4th at p. 128.)

To the extent Orion's Texas counsel performed services for Orion that did not require them to be licensed in California or obtain *pro hac vice* status, the services are not compensable under section 3426.4. *Birbrower* is distinguishable from the present case because the out-of-state law firm in *Birbrower* sought fees under its fee agreement with the client, whereas Orion seeks fees against DTS as a sanction under a fee-shifting statute. An award of attorney fees under a fee-shifting statute like section 3426.4

101

authorizes compensation only for attorney services reasonably necessary to the conduct of the litigation. (Code Civ. Proc., § 1033.5, subdivision (c)(2) & (5); *Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 817-818 [prevailing party seeking attorney fees under section 1794 of the Song-Beverly Consumer Warranty Act has the burden of showing the fees incurred were reasonably necessary to the conduct of the litigation].) Attorney services that are reasonably necessary to the prosecution or defense of a California action necessarily require California licensure. (See Cal. Rules of Court, rule 9.48(f) [permitting out-of-state attorney under certain conditions "to provide legal assistance or legal services concerning only a transaction or other nonlitigation matter"].) Accordingly, any services that Orion's Texas counsel provided in connection with the instant litigation were either not reasonably necessary to the conduct of the litigation or required *pro hac vice* status to be compensable. The court did not err in denying Orion recovery of attorney fees incurred by its Texas counsel.

DISPOSITION

The portion of the amended judgment entered on February 28, 2013, dismissing DTS's second amended cross-complaint with prejudice as to Orion, DeLatte, and the City and entering judgment in their favor is affirmed. The portion of the amended judgment, dismissing DTS's second amended cross-complaint with prejudice as to AutoReturn and entering judgment in AutoReturn's favor is reversed. The portion of the September 24, 2012 order granting AutoReturn's motion for summary judgment or, alternatively, summary adjudication of the fifth and six causes of action of DTS's second amended cross-complaint is vacated. The court is directed to enter a new order denying the motion

102

for summary judgment as to AutoReturn, denying the motion for summary adjudication as to the fifth cause of action, and granting the motion for summary adjudication as to the sixth cause of action.

The portion of the amended judgment in favor of AutoReturn on ACT's fourth amended complaint based on the court's granting of AutoReturn's motion for summary judgment is reversed. The portion of the June 8, 2012 order granting AutoReturn's motion for summary judgment or, alternatively, summary adjudication of the seventh through 14th, 18th, and 21st causes of action of ACT's fourth amended complaint is vacated. The court is directed to enter a new order denying the motion for summary judgment and motion for summary adjudication as to the seventh, eighth, and ninth causes of action of action and the voluntarily dismissed 18th cause of action, and granting the motion for summary adjudication as to the 10th through 14th causes of action and 21st cause of action.

The portion of the September 24, 2012 order granting Orion's motion for attorney fees and costs against DTS under section 3426.4 is affirmed and the portion of the amended judgment awarding those fees and costs is affirmed. The portion of the December 31, 2012 order granting the City and AutoReturn's motion for attorney fees under section 3426.4 as to DTS is affirmed and the portion of the amended judgment awarding those fees is affirmed. The portion of the December 31, 2012 order denying AutoReturn's motion for attorney fees and costs under section 3426.4 as to ACT is reversed with directions to reconsider the motion as to ACT light of the views expressed

in this opinion.  The portion of the May 10, 2013 order granting in part DTS's motion to tax costs and reducing the City and AutoReturn's claimed costs to $10,182.41 is affirmed.

The portion of the July 6, 2012 order denying DTS's motion to file documents under seal; the portion of the September 4, 2012 order denying DTS's motions filed on June 29, 2012, to file documents under seal; the September 13, 2012 order denying DTS's ex parte application to file documents under seal; and the December 18, 2012 order denying DTS's ex parte application file to seal documents under seal are reversed.  The court is directed to enter an order granting DTS's requests to file documents under seal under section 3426.5.

In all other respects the amended judgment is affirmed.  The City is awarded its costs on appeal against DTS.  ACT is awarded its costs on appeal against AutoReturn. The parties shall otherwise bear their own costs on appeal.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

IRION, J.